## MASON v. UNITED STATES.
### No. 181.
Circuit Court of Appeals, Second Circuit.
March 6, 1933.

Harry B. Amey, U. S. Atty., of Burlington, Vt., Allen Martin, Asst. U. S. Atty., of

Essex Junction, Vt., C. L. Dawson and Davis G. Arnold, both of Washington, D. C., and William J. Hession, of Boston, Mass.

Marcell Conway, of Barre, Vt. (Willsie E. Brisbin and William J. Brown, both of Barre, Vt., on the brief), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In January, 1932, the plaintiff brought suit against the United States to recover upon a policy of war risk insurance. This insurance had lapsed on February 28, 1919. To justify recovery, the plaintiff was obliged to prove that prior to that date he sustained "permanent total disability" within the meaning of those words as used in war risk insurance contracts. Regulations issued by the Bureau of War Risk Insurance pursuant to statutory authority (38 USCA § 426) define "total disability" as "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation." Total disability is deemed permanent "whenever it is founded upon conditions which render it reasonably certain that it will continue through the life of the person suffering from it." At the conclusion of the evidence, the defendant moved for a directed verdict on the ground that the plaintiff's proof was insufficient, but the motion was overruled, and the jury returned a verdict for the plaintiff. Upon this appeal the errors chiefly argued relate to the overruling of this motion, and to prejudicial remarks by the trial judge in the presence of the jury.

Mason enlisted in the military service in June, 1917, at the age of 20. He was honorably discharged on January 8, 1919. During his service in France he was gassed on October 28, 1918, as a result of which he remained in a military hospital until the middle of December, when he was sent home on a hospital ship. Mason's certificate of discharge stated that he was in good physical condition on the date of discharge. He testified, however, that when he returned to his home he was not able to do any work; that the gas had affected his eyes, stomach, and lungs and had left scars under his arms and on his body which caused discomfort when he exercised. He complained of watering eyes, shortness of breath, coughing, and expectoration, sweating at night, indigestion, and "nervous spells" simulating epilepsy. He testified that he had never been able to hold a job for more than five or six months, and that his average yearly earnings had been about

$200. Relatives and acquaintances corroborated his testimony that he was not in good condition and not able to work when he returned. Although the record is not very clear as to just what work he did do during the years immediately following his discharge, and although Mason obviously attempted to belittle the amount of his work, we think there was evidence on which the jury could find that he was "totally disabled" on the critical date, February 28, 1919.

■ The chief dispute, as so frequently happens in war risk insurance cases, is whether the evidence would justify a finding that such disability was "permanent." Two doctors whom he consulted shortly after his return had died before the trial. Two other doctors, who testified in his behalf, had first examined him in 1924, and again just prior to the trial. Dr. Wark diagnosed his symptoms as indicating a duodenal ulcer and tuberculosis of the lungs, although he admitted the lung condition might indicate merely chronic bronchitis. He told Mason in 1924 that he "would never be any good to work." Dr. Corson also gave a diagnosis of tuberculosis in 1924 and a prognosis that his nervous disturbance, simulating epilepsy, was likely to get worse. No sputum test for tuberculosis was ever made by either doctor. They relied largely on the history which Mason reported to them, and were clearly misinformed as to the length of time he was able to work continuously. Dr. Wark interpreted X-ray photographs of Mason's lungs, taken shortly before the trial, as indicating a tubercular condition, although he did not state whether it showed an arrested or an active tuberculosis. Physicians testifying for the defendant denied that the photographs showed scar tissue in the lungs. It also appears that shortly after Mason's discharge from the army he was given vocational training at Massachusetts Agricultural College, but was sent home early in 1920 with a letter stating that he was suffering from tuberculosis. He was advised to live in the open, and he obtained a camp in the woods which has been his home a good deal of the time. In June, 1920, Dr. Lazelle examined him for the Veterans' Bureau, made a sputum test, found no evidence of tuberculosis, and gave a diagnosis of chronic bronchitis, with a favorable prognosis. A second examination by Dr. Lazelle in October, 1921, confirmed his first report. In the spring of 1922, Mason again took vocational training under the Veterans' Bureau, this time studying salesmanship. This was discontinued because, as he claims, he lost time

on account of sickness, although he admits that he was notified his training was stopped on account of "leaving or something I had done." In 1923 he married and went to the White Mountains to work for a few months. From November 1, 1923, to April, 1925, he worked continuously for the Central Vermont Railroad. His work was that of a track porter, and required 51 hours per week. The railroad's pay rolls show that he lost practically no time whatever during this entire period. In June, 1924, he was promoted to the position of a yard clerk, with a higher salary. The railroad's records show that he was discharged in April, 1925, for insubordination, due, he says, to being required to lift heavy baggage when he could not. What Mason did during the next two years does not clearly appear. It was probably during this period that he worked for a short time in the Bobbin Mill, and was found unable to do the work. But from April, 1927, to February, 1928, and from April, 1928, to November, 1928, he worked for the Montpelier & Wells River Railroad. Its records show that he lost little time during these periods, and that he was laid off in November because of "reduction in forces." He was re-employed by this railroad in May, 1931, and continued to October 29, when he resigned. On February 15, 1932, he was re-employed temporarily for a month and resigned on "account of sickness." During this last employment, the section foreman under whom Mason worked was his uncle, and the latter testified he was unable to do the work. Mason attempted to belittle the work he was able to do while employed by the railroads, but his self-serving statements should have little weight as against the employers' records. In May, 1930, he underwent a thorough examination at the Chelsea Naval Hospital where photographs were taken of his lungs and gastrointestinal tract. No abnormalities were discovered, and he was discharged with the recommendation that he was able to resume his former occupation.

■ On the entire record it seems to us that only prejudice born of sympathy for a soldier plaintiff could result in a verdict that Mason was permanently and totally disabled in February, 1919. The only medical testimony as to his condition prior to 1924 was Dr. Lazelle's diagnosis of June, 1920, finding chronic bronchitis with a favorable prognosis. The very fact that he was given vocational training shows that his disability was not then believed to be permanent. For a period of sixteen and a half months, beginning No-

vember 1, 1923, Mason worked continuously for the Central Vermont Railroad, earning between $80 and $100 per month. That he was able to do continuous work during that period is conclusively proved. He was no worse afterwards than he was before; his medical history has been about constant throughout. He worked for another eighteen months, with an interval of only six weeks, the reason for which does not appear, for the Montpelier & Wells River Railroad. He was not working under his uncle at this time, so that the latter's testimony as to his inability to do the work in 1932 has no relation to his former employment. Under the rule laid down in United States v. Clapp (C. C. A.) 63 F.(2d) 793, handed down herewith, the evidence in our opinion would not support a finding that in February, 1919, his disability was "founded upon conditions which render it reasonably certain that it will continue throughout his life." At the worst he was in the early stages of tuberculosis. This is often curable, and need not incapacitate permanently from the performance of outdoor work. See Nicolay v. United States, 51 F. (2d) 170, 173 (C. C. A. 10). We think the defendant's motion for a directed verdict should have been granted.

But in any event, the conduct of the trial was such as to require reversal. In his summing up, the plaintiff's attorney apparently made some remark which caused the defendant's attorney to say that the files of the Veterans' Bureau had been in court and no demand had been made to see them. The following colloquy then ensued:

"The Court: If they had demanded, you would have refused to show them, wouldn't you? You have in other cases.

"Mr. Fitzgerald: I would not.

"The Court: Not until the actual trial begins and then under order of court.

"Mr. Fitzgerald: You have never issued an order. The first time I appeared before your Honor you said in your court they could examine the records during the trial, and I have adhered to that since. There has been no demand made at this trial.

"Mr. Conway: They have records we are absolutely forbidden to see.

"The Court: It is all confidential.

"Mr. Conway: Absolutely.

"Mr. Fitzgerald: I would like an exception to that remark."

Further remarks of the same general character continued, in the course of which the court stated: "I happen to know what your practice is, and if they had asked, you wouldn't have given them to him. * * * It is true it is secret in all the cases I have had anything to do with." These remarks gave the impression that the government made a practice of concealing in their files evidence beneficial to the opposing side. It was clearly improper to speak of the general practice of the government, and wrong to allow the comment when the records were in fact available for inspection at the trial upon demand. Nor is this the only instance in the record where the judge failed to maintain an impartial attitude. He displayed a very hostile attitude to the defendant's witness Dr. Wilson, and constantly prompted witnesses for the plaintiff. In these insurance cases brought by soldiers, every sympathy of the jury is with the plaintiff, and it is particularly imperative that the trial judge observe a scrupulous detachment.

Judgment reversed.