# NATIONAL LABOR RELATIONS BOARD
## v. HEARST et al.
### No. 8451.

Circuit Court of Appeals, Ninth Circuit.

March 23, 1939.

Concurring Opinion filed April 28, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Atty., National Labor Relations Board, all of Washington, D. C., G. L. Patterson, Atty. for N.L.R.B., of Seattle, Wash., and John T. McTernan, Atty. for N.L.R.B., of San Francisco, Cal., for petitioner.

Edward G. Woods, of Chicago, Ill., and Grove J. Fink, of San Francisco, Cal. (Edward G. Woods and E. D. Salinger, both of Chicago, Ill., of counsel), for respondents.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

We are petitioned for an order enforcing one made by the National Labor Relations Board.

Respondent William Randolph Hearst owns all stock of respondent American Newspapers, Inc.[1], which owns[2] all stock of respondent Hearst Corporation,[3] which owns all stock of respondent King Features Syndicate, Inc.,[4] and all common stock of respondent Hearst Consolidated Publications, Inc.[5] The latter corporation owns[6] all stock of respondent Hearst Publications, Inc.,[7] which operates directly three newspapers, including the Seattle Post-Intelligencer.

---

[1] A Delaware corporation which operates directly three newspapers.

[2] It also owns all the stock of eight other corporations which operate a total of eleven newspapers.

[3] A California corporation.

[4] A New York corporation.

[5] A Delaware corporation which operates directly four newspapers.

[6] It also owns all the stock of five other corporations which operate a total of five newspapers.

[7] A California corporation which owns all the stock of three other corporations which operate a total of three newspapers.

William Randolph Hearst conducts his publishing activities throughout the United States by means of approximately 36 corporations owned by him directly, or indirectly through subsidiaries, hereinafter called the Hearst organization. The Hearst organization publishes a total of 29 newspapers in 18 cities in Georgia, Maryland, Massachusetts, Illinois, Michigan, California, Wisconsin, New York, Nebraska, Pennsylvania, Texas, Washington and the District of Columbia. It also engages in news service, feature service, newsprint, radio, magazine, news-film, motion picture and financial activities.

Respondent King Features Syndicate, Inc., supplies to the newspapers of the Hearst organization, and sells to other papers, a miscellany of newspaper features, such as comic strips, cartoons, feature articles, serial stories, and novelettes. It also supplies two wire services, International News Service and Universal Service, and a photograph service, International News Photos, which transmit news and photographs to and from all parts of the world. In the course of its business, it sells features and wire service to newspapers in 33 states, 2 territories and 6 foreign countries.

The Seattle Post-Intelligencer is a daily and Sunday newspaper published in Seattle, Washington. Its average circulation for 12 months ending March 21, 1936, is as follows:

| State | Daily | Sunday |
|---|---|---|
| Washington | 96,799 | 172,798 |
| Idaho | 2,375 | 7,532 |
| Montana | 2,813 | 15,523 |
| Oregon | 655 | 11,239 |
| All other states | 308 | 310 |
| Alaska | 108 | 2,399 |
| British Columbia | 1,201 | 12,000 |
| Totals | 104,259 | 221,801 |

From these figures it can be seen that 7.2% of its daily circulation, 22% of its Sunday circulation, and 17.3% of its total circulation is delivered outside the State of Washington.

The Seattle Post-Intelligencer publishes news and feature articles coming to it over teletype machines from the Associated Press, of which it is a member, International News Service and Universal Service. Advertising matter for the newspaper is supplied by a Hearst subsidiary representing all Hearst newspapers, with offices in a number of cities, including Seattle. Various material is supplied by King Features Syndicate, Inc. Two other subsidiaries in the Hearst organization supply supplements which are printed in California, and shipped to the newspaper for inclusion in its Sunday edition. Raw materials and machinery used in the publication of the newspaper, including ink, linotype machines and press parts are obtained in states other than Washington and shipped to it by train, boat and truck.

By the Board's findings, we learn that one Lynch "was employed as a photographer by the Seattle Post-Intelligencer in 1921, and was made manager of the photographic department in 1925". On July 6, 1936, he was discharged. By the Board's findings, we also learn that one Armstrong "was employed by the Seattle Post-Intelligencer in April, 1919, and was the dramatic editor at the time of his discharge on July 14, 1936".

On July 27, 1936, the American Newspaper Guild, Seattle Chapter, hereinafter called the Guild, filed with the Board's Regional Director a charge that respondents had engaged in, and were engaging in unfair labor practices affecting commerce, contrary to the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. On August 13, 1936, the Board issued its complaint alleging that the discharges of Lynch and Armstrong and the refusal to reinstate them, were made "because they joined and assisted the" Guild "and engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection" contrary to § 8(1) and (3) of the Act; and that respondents "by their officers and agents have by various threats, promises, innuendos, and acts of intimidation interfered with, restrained and coerced, and are now interfering with, restraining and coercing editorial employees * * * in the exercise of the rights guaranteed in Section 7 of the" act, contrary to § 8(1) of the act.

The provisions alleged to be violated are:

"Sec. 7. [§ 157.] Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"Sec. 8. [§ 158.] It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title]. * * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." 29 U.S.C.A. §§ 157, 158(1, 3).

Respondents William Randolph Hearst, American Newspapers, Inc., Hearst Corporation, and Hearst Consolidated Publications, Inc., filed a motion to quash service of process stating that the only service of process had was a pretended one made by mailing to each of them a copy of the complaint to offices outside the State of Washington, that none of such respondents at the time of the pretended service or since, resided in Washington, or maintained an office or place of business there, and that none of the respondents were within the State of Washington at the time of the pretended service, at the time the alleged unfair labor practice occurred, or at any time since. Respondent King Features Syndicate, Inc. filed a separate motion to like effect. All these respondents (excluding Hearst Publications, Inc., only) filed a motion to dismiss as to them on the grounds, among others, that Lynch and Armstrong were not alleged to be their employees, and were alleged to be employees of the Seattle Post-Intelligencer.

Respondent Hearst Publications, Inc., answered alleging that the discharges of Lynch and Armstrong were made for cause, and as an affirmative defense that it was not engaged in interstate commerce, but was engaged solely in intrastate commerce; that the Guild went on strike on August 13, 1936, engaged in unlawful acts forcing suspension of publication after the charge was filed and should be estopped from seeking relief because it appears before the Board with unclean hands, and that Lynch and Armstrong had joined in the unlawful acts, and that reinstatement could not be made to their positions which involved trust and confidence. It also filed a motion to dismiss alleging substantially the same facts regarding the misconduct and unlawful acts, including the fact that some 9 employees were beaten by pickets; and that because it had suspended publication it had no employment for either Lynch or Armstrong.

All the above mentioned motions were denied. Hearings were held from September 10, 1936 to September 29, 1936. On October 9, 1936, the Board ordered the proceeding transferred to it. On November 9, 1936 and the following day, additional evidence was presented to the Board. The Board's decision states: "At the close of this hearing, the respondents were granted adequate opportunity to request a further hearing and to file briefs. However, a further hearing was not requested, and no briefs have been filed".

On January 13, 1937, the Board found the allegations of the complaint to be true, and entered an order requiring all respondents to cease and desist from violating § 8(1) and (3), and to offer Lynch and Armstrong reinstatement to their former positions "without prejudice to their seniority or other rights and privileges previously enjoyed", to make them whole for any losses of pay they suffered by reason of their discharge, and to post notices.

On March 18, 1937, Armstrong died without having been reinstated or paid back pay. The Board requests modification of its order, so that it will not require reinstatement of Armstrong, and modification of the order, so that back pay due to the time of his death be paid to Armstrong's personal representative or other person entitled thereto.

On February 3, 1937, respondents filed a petition to set aside the Board's order. On February 23, 1937, the Board filed an answer requesting enforcement of its order. On July 22, 1938, respondents moved that their petition to set aside the Board's order be dismissed, which was sustained by this court on August 1, 1938 "reserving however, to this Court, jurisdiction to proceed upon the cross-petition filed in this proceeding on February 23, 1937 by the National Labor Relations Board for the enforcement of its order dated January 13, 1937, with like effect as if the Board had originally petitioned this Court for enforcement of its order".

■ Respondents assert that the findings are not supported by the evidence. Section 10(e) of the act, 29 U.S.C.A. § 160(e), provides that such findings "if supported by evidence, shall be conclusive" and means that the findings must be supported by "substantial" evidence. Consolidated Edison Company v. National Labor Board, 59 S.Ct. 206, 83 L.Ed. ——, December 5, 1938. The evidence is voluminous, and

will not be set out herein. Insofar as the findings set forth violations of the act by Hearst Publications, Inc., we think they are sustained by substantial evidence. Whether there is substantial evidence that the remaining respondents engaged in the unfair labor practices, is a question upon which we believe, for reasons hereinafter set forth, it is unnecessary to make a decision.

■ Another contention made by respondents, need be given but little consideration. It is said: "The operation of publishing the Seattle Post-Intelligencer was not in interstate commerce and did not affect commerce within the meaning of the act." This contention is beside the point. It is immaterial whether such activities are local in character as shown by the following from National Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." The act itself empowers the Board "to prevent any person from engaging in any unfair labor practice * * * affecting commerce." § 10 (a), 29 U.S.C.A. § 160(a). The power of the Board, as thus defined, is limited to correction and prevention of unfair labor practices which affect commerce as defined in § 2(7) of the act, 29 U.S.C.A. § 152(7).

■ Thus the nature of the particular business or activity is immaterial. If a person, no matter what the character of his business is, engages in an unfair labor practice which affects commerce, the Board may assume jurisdiction of the matter. It is the effect of the unfair labor practices on commerce which is the controlling factor. For example, in Consolidated Edison Company v. National Labor Board, supra, the person charged with violation of the act, was engaged in a business which was intrastate in character, nevertheless, unfair labor practices, which Congress found to be the cause of 25% of the strikes, might stop the activities entirely, and a stoppage of such activities would in turn halt interstate operations. The violator was held subject to the Board's jurisdiction.

■ In the instant case, the strike halted interstate shipments. Such cessation was a direct result of the strike. It is therefore clear that the unfair labor practices directly affected interstate commerce.

■ It is urged that the motions to quash should have been sustained on the ground that there was no valid service on the moving parties. It is implied that no valid service could be had outside the judicial district or Region fixed by the Board, in which the unfair labor practice occurred. There is no suggestion of any lack of actual notice, either because of form or substance of the papers mailed. The contention is based on an alleged lack of geographic reach. By the act service by mail is authorized. § 11(4), 29 U.S.C.A. § 161(4). Likewise the act specifically permits the Board to designate the place of hearing, § 10(b), which implies that service can be made anywhere in the United States. Since "Congress may authorize the civil process of a federal district court to be served upon persons in any other district" (Continental Illinois Nat. Bank v. Chicago, Rock Island & P. Ry. Co., 294 U.S. 648, 683, 55 S.Ct. 595, 609, 79 L.Ed. 1110; United States v. Tacoma Oriental S. S. Co., 9 Cir., 86 F.2d 363, 367), it has power, we think, to authorize service by this act anywhere in the United States.

■ Respondents also contend that the Board's order is void because they were not accorded a fair hearing. It is said that the requirements of due process were violated because the decision was made without brief or oral argument, and without submission of an intermediate report or proposed findings. It is also asserted that the transfer of the proceeding from the trial examiner (who in this case was a Board member) to the Board was also contrary to the requirements of due process. Both arguments are disposed of by National Labor Board v. Mackay Co., 304 U.S. 333, 350, 58 S.Ct. 904, 82 L.Ed. 1381. We think respondents fully understood the issues, and as appears from the record, they were given opportunity to request further hearings and to submit briefs, but they did not avail themselves of the opportunity. Under these circumstances, we think respondents were accorded a fair hearing. Cf. National Labor R. Board v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, 492.

■ It is also contended that a hearing was held in Washington, D. C., upon issues irrelevant and immaterial to the case;

that incompetent and irrelevant evidence was introduced, motions and objections erroneously overruled and sustained, and that the findings were insufficient. So far as the rulings on evidence were concerned, the act provides in § 10(b) that "the rules of evidence prevailing in courts of law or equity shall not be controlling". In addition "Mere error of a court, if any there be, in a judgment entered after a full hearing, does not constitute a denial of due process of law." Corrigan v. Buckley, 271 U.S. 323, 332, 46 S.Ct. 521, 524, 70 L.Ed. 969. We believe that rule to be applicable here.

■ The contention that enforcement of the order should be denied on the ground that the Guild has unclean hands because it engaged in a boycott and caused and incited violence, is disposed of by National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872.

■ Respondents contend that the motions to dismiss should have been sustained, and that the order was defective, because the record discloses that none of respondents were employers of the men in question, except Hearst Publications, Inc. Section 2(2) of the act provides that the term "employer" as used in the act "includes any person acting in the interest of an employer, directly or indirectly". Section 10(c) of the act provides in part that "If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]." It should be noticed that the word "person" and not "employer" is used in the last quoted provision. However, "person" includes "employer". See § 2(1).

Insofar as the order commands all respondents to cease and desist the coercion of employees, we think the order should be enforced. Because of the unified control, the only way of effective prevention of the unfair labor practices, is to compel all respondents to cease and desist the unfair labor practices. All act "di-

rectly or indirectly" for Hearst Publications, Inc., the nominal employer here, which brings them within the definition of "employer" which is included in the term "person".

■ With respect to that part of the order which requires respondents to offer to the employees in question "immediate and full reinstatement, respectively, to their former positions, without prejudice to their seniority or other rights and privileges previously enjoyed", we find a different situation. Reinstatement means to return to a post previously held. The men in question previously held posts with Hearst Publications, Inc., and one of them did some work for King Features Syndicate, Inc., but there was no evidence that the rest of respondents employed the men in question. It would therefore be impossible for such respondents to "reinstate" the men in question. While several corporations might, together, employ one man, there is no evidence here that all of the respondents employed the men in question. It might well be said that the order as it stands is impossible of fulfillment. However that may be, we hold that the respondents, other than Hearst Publications, Inc., and King Features Syndicate, Inc., were not the employers of the men in question, they cannot be compelled to reinstate such men, or to pay them back pay. National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., supra, 99 F.2d page 537.

■ There is a further contention that by the order, back pay is ordered for the period from August 13, 1936 to November 25, 1936, a time when the newspaper plant was shut down, and therefore Hearst Publications, Inc., had no employment to offer the men in question. That contention is, we think, immaterial. In practically all the cases where back pay is ordered, the men have not worked, but such fact is not considered an obstacle to the order. It is no more illogical or unreasonable to say that back pay may be awarded when the employer does not furnish work, than when the employee does not furnish his services. In addition it should be mentioned that the strike which caused the plant to close, was caused by the unfair labor practices.

■ It is stated in respondent's brief that the men in question had received, in lieu of employment, from Hearst Publications, Inc., six months' salary prior to November 25, 1936, which is the day the

strike ended. Although the order requires deduction from the amount each of the men would have earned, the amounts each actually "earned", we interpret the latter word as including such payment.

■ The final point arises by reason of a request by the Board for modification of its order, by deleting Armstrong's name from that part of the order requiring his reinstatement, and by providing that his back pay be paid his personal representative. It is conceded that Armstrong died on March 18, 1937 about two months subsequent to the date of the Board's order. The Board intimates that a private right of action accrued to Armstrong which survived his death. We think Congress did not intend to create any private right. See House Committee on Labor Report No. 972, 74th Congress, p. 21, quoted in National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., supra, 99 F.2d page 537.

■ Respondents contend that back pay may be awarded only with reinstatement, and since Armstrong cannot be reinstated, no back pay may be awarded. We think this argument is partially sound. As said in National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., supra, 99 F.2d page 537, the act does not "permit an award of back pay without reinstatement" but the controlling time with respect to the "reinstatement" provision is the "time of the Board's order". Page 538. Since Armstrong could have been reinstated when the Board's order was made, back pay could properly be awarded.

The question as to whether or not the back pay may be awarded to Armstrong's personal representative is more difficult. In Consolidated Edison Company v. National Labor Board, supra, it was said [59 S.Ct. 220]:

"The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act. * * *"

See to the same effect, National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., supra, 99 F.2d page 537.

Here one of the consequences of the unfair labor practices was that Armstrong lost his pay. That consequence was removed or avoided by the Board's order. Had Armstrong been paid, his estate would have had the advantage of such pay. Now, the consequence may still be removed or avoided by payment to the personal representative. We hold that the Board may properly infer that the proposed modification is "an appropriate way to give effect to the policy of the Act" (National Labor Bd. v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307) and for purpose of enforcing the order, will consider such order as modified.

The order will be enforced only as stated in the foregoing opinion.

STEPHENS, Circuit Judge, concurring.

While I am in general agreement with the opinion prepared by Judge Haney, there is one statement therein to which I wish especially to refer. I quote from the opinion:

"Respondents contend that back pay may be awarded only with reinstatement, and since Armstrong cannot be reinstated, no back pay may be awarded. We think this argument is partially sound. As said in National Labor Relations Bd. v. Carlisle Lumber Co., 9 Cir., supra, 99 F.2d 537, the act does not 'permit an award of back pay without reinstatement' but the controlling time with respect to the 'reinstatement' provision is the 'time of the Board's order'. (Page 538). Since Armstrong could have been reinstated when the Board's order was made, back pay could properly be awarded."

In my concurring opinion in National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 95 F.2d 533, 543, my divergent views on the subject of back pay with or without reinstatement are pointed out, and I do not wish any expression in this case to be taken as a recession therefrom. See National Labor Relations Board v. Fansteel Metallurgical Corporation, 59 S.Ct. 490, 83 L.Ed. ——.