## NATIONAL LABOR RELATIONS BOARD v. AIR ASSOCIATES, Inc.

### No. 292.

Circuit Court of Appeals, Second Circuit.
July 9, 1941.

As Amended on Denial of Rehearing
Oct. 15, 1941.

Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Richard C. Barrett, and David Findling, all of Washington, D. C., for petitioner.

Scandrett, Tuttle & Chalaire, of New York City (Walter Chalaire Soia Mentschikoff, both of New York City, of counsel), for respondent.

Before SWAN, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

In answer to a petition by the National Labor Relations Board for enforcement of its order against respondent, the latter asserts that it was denied a fair and impartial hearing, that the Board's findings of fact are not based on substantial evidence, and that changed circumstances have made enforcement of the Board's order unjust and inequitable.

█ Respondent rests its contention as to the absence of a fair and impartial hearing on the alleged bias of the trial examiner. That would be a serious matter, if there was such bias and (equally important) if it affected, or probably affected, the Board's findings and order. Cf. Ohio Bell Tel. Co. v. Public Utilities Commission, 301 U.S. 292, 304, 305, 57 S.Ct. 724, 81 L.Ed. 1093; Tumey v. Ohio, 273 U.S. 510, 523, 535, 47 S.Ct. 437, 71 L.Ed. 749, 50

A.L.R. 1243. Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038. For a fair trial is a civil right of "peculiar sacredness"[1] guaranteed by the Constitution. It is for that reason that, if the misconduct of a trial judge, in the presence of a jury, probably affected the jury in such manner as to have influenced their verdict, judgment must be reversed. United States v. Minuse, 2 Cir., 1940, 114 F.2d 36, 39; Mason v. United States, 2 Cir., 1933, 63 F.2d 791, 793.

If there were equivalent factors here, the record would be contaminated and unquestionably the Board could not lawfully act on it. But here the fact-finder was the Board, not the trial examiner. Even if bias against respondent was manifested in the examiner's intermediate report and recommendations, that bias became immaterial, since the Board ignored that report and relied solely and directly on the evidence in the record. The Board, patently, is not in the same position with respect to its examiner as is the jury with respect to the trial judge; no one would say that the judgment of a trial judge, sitting without a jury, should be reversed because of inflammatory remarks addressed to him by a lawyer for one of the parties to the suit; the Board must be presumed to be capable of resisting any unfair attitudes expressed to it by its subordinates, including its attorneys or the trial examiner, cf. N.L.R.B. v. Ford Motor Company, 9 Cir., 1941, 118 F.2d 766. That the Board disregarded the examiner's report serves to answer respondent's objections concerning bias, if any, disclosed in his report.

██ Respondent, however, urges that the examiner was biassed and that, accordingly, the testimony taken before him, and on which the Board directly relied in making its own findings, was incurably infected. In making this point, respondent apparently admits that, as the Board found, the examiner committed no prejudicial error; yet, it is contended, the examiner's

---

[1] The phrase is used in connection with certain aspects of criminal proceedings, which, for divers reasons, are guarded with unusual care, but it indicates, in general, a high regard for the importance of a fair trial. Cf. Avery v. Alabama, 308 U.S. 444, 445–447, 60 S.Ct. 321, 84 L.Ed. 377; Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682; Lewis v. United States, 146 U.S. 370, 374, 375, 13 S.Ct. 136, 36 L.Ed. 1011; Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555; Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314.

bias alone, although not resulting in such error, renders the whole proceeding an un-constitutional invasion of respondent's rights. The evidence which respondent has painfully gleaned from a long record does not make out a convincing case of the examiner's bias. Even assuming, however, that it were proved, either by the record or otherwise, that the examiner was biassed against respondent, we would find no reason, merely because of that fact, for upsetting the Board's order, since respondent does not assert that the examiner committed any error in the admission or exclusion of evidence, nor is there any indication that he conducted himself in a manner which either was likely to intimidate any of the witnesses or to prevent any of them from giving any relevant testimony as to what they believed to be the facts. An examination of the record shows no such unfairness as to constitute a denial of due process. Cf. Cupples Co. Manufacturers v. N. L. R. B., 8 Cir., 1939, 106 F.2d 100, 113. Where such unfairness is charged, "each decision must be based upon the peculiar facts of the case involved and the kind and degree of the impropriety * * *"; N. L. R. B. v. Ford Motor Co., 6 Cir., 1940, 114 F.2d 905, 909[2]; cf. Press Co., Inc., v. N. L. R. B., App.D.C.1940, 118 F.2d 937. There was, at most, error without prejudice; such error is harmless and no ground for reversal.[3] A harmless error is a blank cartridge.

█ Respondent argues, by analogy, that, since due process historically required that a decision of a jury selected by a biassed sheriff be disregarded, even without direct proof that the jury itself was prejudiced, the Board is required to reject testimony taken by an examiner who is biassed, even without a showing that the bias affected the record. The historical material gathered by respondent is interesting, but does not help its case: The sheriff picked those from whom the jury was selected; and, as a jury, made up of men hand-picked by a prejudiced sheriff, might well be untrustworthy, it was not inappropriate to presume, even conclusively, that such a jury would be unfair and, therefore, that the sheriff's prejudice would yield harmful results. Respondent refers to a case in Elizabeth's reign in which, as respondent puts it, "the mere fact that the sheriff and one of the coroners and one of the parties to the litigation wore the same livery was held sufficient to justify granting the venire to another coroner in order to prevent voiding the judgment". The use of the word "mere" is surprising. For in the word "livery" are compressed several hundred years of English judicial and "constitutional" history: Many a powerful baronial magnate would assemble a band of faithful retainers; he supplied them with coats, known as "liveries," marked with his distinctive badge; he used his liveried adherents for divers purposes, including that of tempering with and coercing juries; that evil persisted, despite royal efforts to suppress it, during the 14th, 15th and 16th centuries.[4] If, then, a sheriff

---

[2] The Court thus distinguished Inland Steel Co. v. N. L. R. B., 7 Cir., 1940, 109 F.2d 9; Montgomery Ward & Co., Inc., v. N. L. R. B., 8 Cir., 1939, 103 F.2d 147. On the same basis, we distinguish N. L. R. B. v. Washington Dehydrated Food Co., 9 Cir., 1941, 118 F.2d 980.

[3] N. L. R. B. v. American Potash Corp., 9 Cir., 1938, 98 F.2d 488, 492; Greenleaf v. Birth, 5 Pet. 132, 135, 8 L.Ed. 72; Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 439, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691; Kanawha & M. Railway Co. v. Kerse, 239 U.S. 576, 582, 36 S.Ct. 174, 60 L.Ed. 448; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240, 60 S.Ct. 811, 84 L.Ed. 1129.

[4] To eliminate that evil, a statute was enacted in 1390, prohibiting the granting of liveries. But that Act was ineffective; cf. the Statute of Liveries, 19 Henry VII c. 14 (1504). It was, indeed, one of the functions of the Star Chamber in Tudor days to save the jury system by punishing powerful magnates who tried to perpetuate the practice of the preceding era, i. e., of bribing and bullying jurors to such an extreme that a jury trial had become an instrument of gross injustice. See, e. g., Gardiner, Student's History of England (1898) 281, 321, 322, 345, 346; Radin, Anglo-American Legal History (1936) 214, 215, 71; Wingfield-Stratford, History of British Civilization (1928) I, 275; Maitland, English Constitutional History (6th Ed. 1925), 316, 491; Adams, Constitutional History of England (1921) 247, 248. It was, doubtless, in part because of the service it rendered in thus saving the jury system, that Coke described the Star Chamber (in which he often sat) as "the most honorable court (our Parliament excepted) that is in the Christian world". 4 Inst. 65. And see Holdsworth, History of English Law, I (3d Ed. 1922) 343, 504 ff.; V (1924) 177,

"wore the same livery" as one of the parties to the litigation, that was the equivalent of the situation which would exist today if Al Capone were involved in a law suit and the jury commissioner were one of Capone's gang. There is nothing similar here: The prejudiced sheriff selected the persons from whom the jury would be chosen; but the trial examiner is selected by and does not select the members of the Board—and they are the fact-finders and decision-makers here.

It is conceivable that, even in a trial before a judge without a jury, the conduct of the judge might be so unfair as to give rise to sufficient inference of a prejudice in his findings to warrant a reversal of a judgment entered by him. But here the trial examiner made no decision and his tentative findings were disregarded. He was like a master, appointed by a court, merely to take and report testimony; but, absent a showing of harmful error in the admission or exclusion of evidence or of intimidation of witnesses, or the like, no court would order a retaking of the testimony heard before such a master solely because he was biassed, for, in such circumstances, his bias could have no practical hurtful consequences on the ultimate outcome of the trial.

And so here. That an officer, even if his only function is to take and report evidence, should conduct himself in a seemly manner is highly desirable; if, deplorably, he does not do so, he renders a serious disservice to the governmental agency which he serves, and he should, at a minimum, be severely admonished by those who employed him. But his bad manners, if they have no effect on the testimony, surely do not require the delays and expense which would be involved in its retaking. Courts do not sit to conduct a school of etiquette or to censure bad manners which result in no harm; that kind of supervision must be left to other branches of the government.

Such has been the attitude of upper courts with respect to trial judges. As we said recently [5]: "We have examined the passages of which the accused complains, and, while at times the judge was somewhat curt in his rulings, it would be unwarranted to hold that his bearing towards the accused could have really prejudiced him with the jury. It would be idle to take up the details of a criticism which as a whole appears to us unfounded. Indeed, the disposition of courts to reverse judgments because of minor excesses in the exercise of the judge's authority at the trial has much abated; separate passages cut from their context and from the trial as a whole, often have an apparent importance which in fact they do not deserve. We do not of course mean that we may ever abdicate our essential duty of insuring an impartial conduct of the trial; that is quite as important as an understanding of the rights and liabilities involved—indeed, in the end even more so—but nothing conduces less to it than an over jealous scrutiny of every word that may fall from the judge's mouth." We perceive no good reason for applying a stricter rule to so-called quasi-judicial officials. We have in mind that the Supreme Court the other day repeated its admonition that "the integrity of the administrative process must be respected" equally with the judicial; United States v. Morgan, May 26, 1941, 61 S.Ct. 999, 85 L. Ed. ——. Trial examiners and members of administrative boards—and judges—are all human, and it is unreasonable to demand that any human process be absolutely flawless. The work-a-day world is no place for the perfectionist.[6]

■ Consequently, we find no merit in respondent's contention. Besides objecting to the enforcement of the Board's order, respondent has filed a motion for leave to adduce additional evidence of the trial examiner's bias. The foregoing discussion is applicable to that motion, which is, therefore denied. We do not propose to turn a trial of the issues into a trial of the trial examiner.

■ Respondent suggests that a reading of the Board's decisions in other cases shows that the Board "has created an operating presumption of non-credibility" of employers' witnesses, and has employed that presumption in the instant case. That suggestion is obviously one which we have no right to entertain. Congress has as-

---

203; cf. II (3d Ed. 1923) 414 ff. 458, 459. The Star Chamber, of course, later came into disrepute, and was abolished, because of its oppressive political activities under the first two Stuarts; see, e. g., Holdsworth, supra, I, 514, 515.

5 United States v. Warren, 2 Cir., June 4, 1941, 120 F.2d 211, 212.

6 Cf. Dunlop v. United States, 165 U. S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799.

signed to the Board, and not to the courts, the function of passing on the credibility of witnesses. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368. And the Supreme Court, during a period of more than thirty years, has often condemned, as both an impractical and an unwise judicial undertaking, the "probing of the mental processes" of officials engaged in reaching decisions, pursuant to statute, on the basis of evidence presented to them. Fayerweather v. Ritch, 1904, 195 U.S. 276, 306, 307, 25 S.Ct. 58, 49 L.Ed. 193; Chicago B. & Q. R. Co. v. Babcock, 1907, 204 U.S. 585, 593, 27 S.Ct. 326, 51 L.Ed. 636; Morgan v. United States, 1938, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129; United States and Secretary of Agriculture v. Morgan, May 26, 1941, 61 S.Ct. 999, 85 L.Ed. —; cf. N. L. R. B. v. Ford Motor Company, 9 Cir., 1941, 118 F.2d 766; DeCambra v. Rogers, 1903, 189 U.S. 119, 122, 23 S.Ct. 519, 47 L.Ed. 734; United States ex rel. West v. Hitchcock, 1907, 205 U.S. 80, 85, 86, 27 S.Ct. 423, 51 L.Ed. 718; United States v. Chemical Foundation, 1926, 272 U. S. 1, 15, 47 S.Ct. 1, 71 L.Ed. 131.

 Respondent argues that, as the intermediate report of the examiner, to which it filed exceptions, was discarded, it was accorded no opportunity to defend itself in the hearing before the Board itself. But N. L. R. B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 350, 58 S.Ct. 904, 82 L.Ed. 1381, shows that the test of a fair hearing is whether the issues were clearly defined, so that respondent could address itself to the charges made against it. Cf. Morgan v. United States, 304 U.S. 1, 22, 58 S.Ct. 773, 999, 82 L.Ed. 1129; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 226-229, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Biles Coleman Lumber Co., 9 Cir., 1938, 98 F.2d 16, 18; N. L. R. B. v. American Potash & Chemical Corp., 9 Cir., 1938, 98 F.2d 488, 492; N. L. R. B. v. Hearst, 9 Cir., 1939, 102 F.2d 658, 662. Respondent does not even argue that any issues, of which it was not warned, and upon which it was therefore unprepared to defend itself, were raised by the Board, in its findings and decision, after the oral argument, except to assert that a "novel theory" was adopted by the Board as to the discharge of Rodolitz and Geoghegan; because of our disposition (discussed below) of the reinstatement order as to those men, we need not pass on whether, in such circumstances, the adoption of a "novel theory" in the decision of a case constitutes the denial of a fair hearing. Respondent also asserts that the Board's procedure was a deviation from its prescribed rules of practice, and hence invalid, citing Mahler v. Eby, 264 U.S. 32, 44, 44 S.Ct. 283, 68 L.Ed. 549. Even if that case is applicable, it is sufficiently answered by Board Rule 37(c), 1 Labor Law Service, 5622, which allows the Board to adopt one of several stated procedures or to make some "other disposition" of the case; respondent does not contend that the rule is invalid.

 We turn now to the evidence. The record supports the Board's finding that respondent committed violations of section 8(1) of the Act, 29 U.S.C.A. § 158(1), by coercion and interference with the union activities of its employees. True, the president's statement that he would not deal with an "outsider" did not warrant a finding that he had practiced coercion, for that statement was qualified by a willingness to bargain with an "outsider" if the union secured a majority. But there was other evidence sufficient to support that finding; no useful purpose, however, will be served by setting it forth. Accordingly, we proceed to the question of violations of section 8(3) by discriminatory discharges.

 The finding that Werner and Thompson were discharged because of their union activity was well supported by the evidence. The Board found, and, we think, rightly, that these men were of proven ability, that their services were needed by the company, and that the sole ground of their discharge was their active participation in union affairs. As to Seifert, the evidence is less conclusive. He had spoiled a piece of work, and this was the ostensible reason for his discharge. Nevertheless, we think there was sufficient evidence on which the Board could make its finding; in particular, respondent's offer to retain Seifert if the union paid for the spoilage, followed by an abrupt withdrawal of the offer before the union had come to a decision, could, in the circumstances, be interpreted by the Board as showing that respondent was suspiciously anxious to place the blame for the spoilage on the union; and the hasty manner in which Seifert was discharged, after a previous excellent record and in spite of the fact that similar spoilages by others had in the past not led to discharge, indicated that the spoilage was a welcome pretext. The

contention that this spoilage was of far greater importance than the amount at stake is belied by the offer to retain Seifert if $60 was paid by the union; at any rate, we cannot say that the Board's finding was capricious and without sufficient support in the record.

■ In ordering the reinstatement of Rodolitz and Geoghegan, however, the Board acted on insufficient findings. The Board found that these men were discharged in order to create resentment against the union and to counteract the effect of the union's success in securing the reinstatement of four shop committeemen, who had been discharged by respondent. Section 8(3) requires that the discrimination in regard to tenure of employment have both the purpose and effect of discouraging union membership. The Board made a clear finding that the purpose of the discharges was to discourage membership in the union, and we think that finding was sufficiently supported by evidence to the effect that (1) the discharges, which preceded the reinstatement of the committeemen by one day, were not in fact necessary, and (2) anti-union statements were made to the two men at the time of their discharges. But we can discover no satisfactory explanation by the Board which would permit either a finding that the unlawful purpose had the effect required by the act, or findings from which such an effect might reasonably be inferred. The reinstatement order is modified, therefore, to omit Rodolitz and Geoghegan.

■ The Board's order contains the conventional provision, restraining respondent from interfering with or coercing its employees "in any other manner" in the exercise of their rights under section 7 of the Act, 29 U.S.C.A. § 157. We do not think that, in the circumstances of this case, the blanket order comes under the condemnation of the Express Publishing case, N. L. R. B. v. Express Publishing Co. March 3, 1941, 61 S.Ct. 693, 699, 85 L.Ed.

——. There the court refused to sanction the injunction of action "unlike and unrelated" to a violation already committed; but it recognized that possible new violations could properly be enjoined where "they bear some resemblance to [those already] committed," or where "danger of their commission in the future is to be anticipated from the course of [the respondent's] conduct in the past". The violations shown here, of sections 8(1) and 8(3), were a sufficient indication that violations might be expected in the future to justify the board order; it is noteworthy that in the Express Publishing case, supra, the violation was of section 8(5), which was said by the court to be only a "technical" violation of section 8(1), while here there was a direct violation of section 8(1), as well as of 8(3). Following the distinction made by the Supreme Court, other circuit courts of appeals have upheld blanket orders in cases similar to the one before us. See American Enka Corp. v. N. L. R. B., 4 Cir., 119 F.2d 60; Oughton v. N. L. R. B., 3 Cir., 118 F.2d 486; N. L. R. B. v. Reid & Prince Mfg. Co., 1 Cir., 118 F.2d 874 [7]

■ The final question is whether changed circumstances have made it unjust to enforce the Board's order. Respondent argues that its business has changed in character and grown in size, but it does not appear that there is no available work of the kind formerly done by the three men whose reinstatement is ordered. Respondent also argues vaguely that reinstatement will be a disservice to national defense; that is an appeal, which, because of its gravity, should not be made lightly; we find nothing in the record adequately to support it here. Whatever we might perhaps do otherwise, we will not here, in the absence of ample proof of inequity, exercise our power under the Act[8], unguided by any explicit standards, to modify the Board's order.

The petition is granted as modified.

[7] The Board's request to modify the "work relief" provisions of the order, as required by Republic Steel Corp. v. N.

L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L. Ed. 6, is granted.

[8] Section 10(e), 29 U.S.C.A. § 160(e).