**NATIONAL LABOR RELATIONS BOARD
v. MOENCH TANNING CO., Inc.**

No. 229.

Circuit Court of Appeals, Second Circuit.

July 17, 1941.

David Shaw, of Washington, D. C., for petitioner.

Kevin Killeen, of Buffalo, N. Y., for Moench Tanning Co., Inc.

Frederic Weyand, of Gowanda, N. Y., for Tancraft Workers of Gowanda.

Sidney Elliott Cohn, of New York City, for Leather Workers Union of Gowanda, Local 44, Intervenor.

Robert B. Watts, General Counsel, Laurence A. Knapp, Associate General Counsel, Ernest A. Gross, Assistant Gener-

al Counsel, Owsley Vose, and Edward J. Creswell, all of Washington, D. C., for National Labor Relations Board.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon a petition of the National Labor Relations Board for an order of this court to enforce an order of the Board against the respondent, a wholly owned subsidiary corporation of the Brown Shoe Company, Inc., of St. Louis, Missouri. The respondent is a tannery, doing business in the little village of Gowanda, New York, which ordinarily employs between 500 and 600 people. The order of the Board enjoined it from refusing to bargain collectively with a local of the Congress of Industrial Organizations, and from "dominating or interfering with the administration" of an unaffiliated union of its employees, known as the "Tancraft Workers of Gowanda," or from "performing any contracts for working conditions to which that union was a party." It also forbade generally the violation of § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, in the precise terms of that section. As affirmative relief, it directed the respondent to bargain with the C. I. O. local and to withdraw all recognition from the unaffiliated union and disestablish it; it concluded with the usual requirement that notices of conformity with its provisions should be posted. The Board found in substance the following facts.

Until July, 1937, the respondent's employees were altogether unorganized. After the refusal of their demand for an increase of wages, about twenty-five employees in the "rolling room" began to agitate for the formation of a union. One, Powell, who was in charge of all the "labor policies" of the respondent and visited its plant every two or three weeks, upon learning during one of these visits that the employees proposed to organize a union, told them that the respondent would negotiate with it, but he suggested that they should keep it a local organization and "not pay money to outside unions" which had caused so much trouble "down East." At a later meeting, Powell and Moench, the respondent's president and one of its superintendents, and Keister, another superintendent, met the new officers of the union, and Powell again advised them to keep it local, arguing that unaffiliated unions had

been successful whereas affiliated had not, and giving as one instance a C. I. O. affiliate where the men were then out of work. The union officers asked him to treat with their union as the only bargaining representative for the plant, but he refused to recognize them as representing more than their members, on the ground that the law forbade his bargaining with a single union of employees, or even learning the names of its members. In August, Bates, the union president, again pressed his demand for recognition of the union as the only representative, and Powell again refused; by that time 500 of the 550 or 560 employees had become members. In September, Powell met the officers of the union and submitted to them a revision of a working agreement prepared by them during the summer; they agreed to his changes but then refused to sign it, though he promised orally to pay time and one-third for work in excess of 40 hours a week. Later, when the union complained that this stipulation had been violated in the case of the "pack pullers," Moench and Keister declared that they did not remember that any such wage had been agreed upon; and while Powell did not do that, he refused to pay the overtime because he said that the "pack pullers" were slacking their work "because of the union." Furthermore, when the union offered to prove the contrary, he refused to hear them. In September certain C. I. O. representatives came to the plant to affiliate the local union, and Moench called Bates to his office where Powell questioned him about what took place at the meetings. Shortly thereafter, Mayer, an employee who had at least some "supervisory" powers, urged Bates to quit the union and promised him a steady job if he did. (Mayer from then on was active and open in his hostility; so much so, indeed, that in March, 1938, the respondent's officers compelled him to stop.)

In spite of these efforts the union did so affiliate in October, 1937, by a vote of about three to one; and thereafter it continued fruitless negotiations with the respondent's officers, until the plant was shut down on January 10, 1938. The Board has not found that the shutdown had any relation to the affilation of the union with the C. I. O., and the only evidence is that it had not. The shoe business had become bad, and the parent company was already well stocked with tanned hides. The respondent opened up again on March 7th—though with a ten per cent. wage cut—and

meanwhile the new union had been formed —"The Tancraft Workers of Gowanda"— whose disestablishment the Board has ordered. Some of the "supervisory" employees had told the men that the shutdown was due to the connection of the existing union with the C. I. O. and the village newspaper had suggested the same thing. The new union was organized by employees, one of whom at any rate declared that the respondent preferred an unaffiliated union. By the first week in March, the organizers had secured the signatures of a substantial number of the 350 employees, who had been recalled to work; and on March 14th, 300 or 400 of the employees attended a meeting, over which the village attorney presided. He told this meeting that the respondent did not like the C. I. O. and would not co-operate with it, that it liked a small union, and that, so organized, the men would get more work than if they were affiliated with a national union. He asked all those who were interested in the new union to follow him from the hall. Only about twenty-seven did, and two days later these men met in his office (three or four "supervisory" employees were among them) and the union was then organized, the president being one Brown, whom the Board, on somewhat doubtful evidence found to be a "supervisory" employee. By the 28th of April, the local union claimed to represent "upwards of 170" employees (it does not appear how many it ever actually did enroll) and demanded recognition, and on the 29th the respondent declared that it would negotiate with it, though, as in the case of the first union, only on behalf of its own members. The charge on which this proceeding was founded had been filed on April 7th.

■ It is apparent that if the foregoing findings were supported by "substantial" evidence they justified the conclusion that the respondent had refused to treat the first union as a representative of its employees before its affiliation with the C. I. O.; that it had intervened to prevent that affiliation; and that it similarly refused to deal with it after the affiliation. In this aspect of the case the respondent can, and does, do no more than ask us to make a decision upon the evidence de novo. We have often declared—as have all other courts—that we would not, because we lawfully could not, do so; we have not the same power as in reviewing a master or a judge, though it appears to be difficult for the bar to become reconciled to that fact. There really can be no debate that even without the declarations of "supervisory" employees, there was adequate evidence to support all the findings, except those on which the "disestablishment" provisions of the order must stand. However, if these do not require the support of those declarations, at least without them their validity is open to dispute.

■ Such evidence would not of course have been competent at common law to affix liability to an employer, unless they had been uttered within the scope of the declarant's authority. The rule is otherwise, however, as to this statute, for the Supreme Court has decided in three recent cases that declarations made by "supervisory employees" will charge the employer though they would not charge him under the doctrine, respondeat superior. International Association, etc., v. N. L. R. B., 311 U.S. 72, 79, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368. The result of this is that interference by such employees with the rights guaranteed by § 7 is legally the equivalent of interference by the employer himself. The question is not one of evidence, but of imputed liability. In the case at bar there were enough such declarations to support a finding that they had contributed to the formation of the "Tancraft Workers" union by creating a belief that such a union would be satisfactory to the company. How far they had in fact done so, and whether it was necessary to "disestablish" that union to free the right of collective bargaining, it was for the Board to say. Our powers of review over that decision are especially narrow, the issue being regarded as one in which the Board is peculiarly adept. Past evidences of an employer's favor or disapproval may obviously load the scales of choice and require correction, and that correction may even demand the abolition of a union formed to gain his approval. We cannot, however, see how the declarations of the city attorney and of a "local banker," or the articles in the village newspaper (later repudiated by the company, as it happened) can be brought into the same class as the declarations of "supervisory employees." The Board's conclusion that these emanated, even indirectly, from the company, seems

to us to be without support in the evidence; it was quite as likely that they arose from the spontaneous hostility of the declarants personally. If so, obviously the respondent ought not to be charged with them, and if "disestablishment" had depended upon them we should not sustain that provision of the order. It does not, for the reasons we have just given.

The clause which incorporates, verbatim et literatim, the contents of § 7 the court, as now constituted, thinks contrary to National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. ——, but we have just held otherwise in a situation which so far as we can see is indistinguishable for practical purposes, and we defer to the authority of our earlier decision. N. L. R. B. v. Air Associates, Inc., 2 Cir., 121 F.2d 586.

An enforcement order may pass.