NATIONAL LABOR RELATIONS BOARD v. PRECISION CASTINGS CO., Inc. (PRECISION EMPLOYEES ASS'N, Intervener).

No. 9099.

Circuit Court of Appeals, Sixth Circuit.

Aug. 28, 1942.

Philip G. Phillips, of Cincinnati, Ohio (Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, Joseph B. Robison, and Ralph Winkler, all of Washington, D. C., on the brief), for petitioner.

Harry E. Smoyer, of Cleveland, Ohio (Stanley & Smoyer, Welles K. Stanley, Harry E. Smoyer, and Eugene B. Schwartz, all of Cleveland, Ohio, on the brief), for respondent.

Richard S. Horan, of Cleveland, Ohio (R. S. Horan and Ralph W. Bell, both of Cleveland, Ohio, on the brief), for intervener.

Before HICKS, HAMILTON, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

The Board had jurisdiction and found that respondent was guilty of unfair labor practices within the meaning of Sections 8(1) and (2) of the National Labor Relations Act, 29 U.S.C. Sec. 158(1) and (2), 29 U.S.C.A. § 158(1, 2), and ordered it to cease and desist from dominating, interfering with or supporting the Old Welfare Club (herein called O. W. C.), or the Precision Employees Association, the intervener (herein called P. E. A.); from giving effect to any contracts with P. E. A. and affirmatively to withdraw recognition from and disestablish the P. E. A. and to notify the employees that the contract with P. E. A. is in violation of the Act, reserving, however, any legal rights which employees may have acquired thereunder and to post appropriate notices.

Events giving rise to the order extended from 1936 through the year 1939. Respondent, a New York corporation, operated plants in Fayetteville and Syracuse, N. Y., and in Cleveland, Ohio, where some 180 people were employed. We are here concerned only with practices at the Cleveland plant.

Respondent attacks that portion of the order involving the O. W. C. and points out that the Board in its amended complaint admitted that the O. W. C. became inactive in 1937, and that the Examiner in his intermediate report found that, following a failure of respondent in June, 1937, to heed complaints of the O. W. C., it "consequently died."

As we have pointed out in Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 43, the complaint, which is in the interest of the public, is not to be treated with that particularity required of a declaration at law or a bill in equity. See also National Labor Relations Board v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557. But, regardless of what might be said touching the sufficiency of the amended complaint, a fourth amended charge was filed at the hearing which alleged that respondent, early in 1936, had continuously discouraged union organization by starting and supporting the O. W. C.

The Board skirted the question of when the O. W. C. ceased to exist by finding that

it either continued to exist in its own right or was succeeded as a labor organization by the Benefit Association of Railway Employees (herein called B. A. R. E.).

The O. W. C., variously referred to in the record as the Welfare Club, Welfare Employees Association, the Welfare Association, the Association, the Precision Employees Welfare Association, came into existence in the summer of 1936 following a strike in respondent's plant. Millspaugh, general manager, and Weigolt, factory manager, attended at least one of its meetings. Respondent also contributed substantial sums to it for social festivities. During its heyday the O. W. C. did present some complaints to the management as to working conditions.

In July, 1937, the B. A. R. E. issued a group insurance policy to respondent covering all its employees who paid the requisite premium. The premium, initially amounting to $1.25, was collected by respondent by check-off and twenty-five cents of this was returned by the B. A. R. E. to a local chapter chartered by it at respondent's plant under the name of "Precision Castings Social-Benefit Club" (which we shall refer to as the B. A. R. E. club in contradistinction to the O. W. C.). The B. A. R. E. club was also referred to in its charter as a "Local Welfare Association" and was spoken of by Millspaugh, Weigolt and its president, Webbeking, and others, as the "Welfare Club," a favorite designation of the O. W. C.

It seems clear that the B. A. R. E. plan was launched at a meeting of the O. W. C. in June, 1937. Weigolt testified that this marked the end of the O. W. C.; that in the summer of 1937 the "Association Club came to life and . . . automatically took over." Webbeking testified that as late as 1938, complaint was made to respondent by the "Welfare Club" as to working conditions on the occasion of abolition of vacations with pay. Webbeking seemed to be referring to the B. A. R. E. club as the complaining body, although there was evidence that this was illegal and that the B. A. R. E. club was prohibited by its by-laws from labor activities.

■ We need not decide whether the B. A. R. E. club was the lineal descendant of, or succeeded to the functions of, the O. W. C. In the record each is referred to interchangeably as the "Welfare Club." It is conceivable that the O. W. C. became inactive in 1937 as an organization. Nevertheless, it continued, in the sense that the witnesses were prone to refer to both it and the B. A. R. E. club by the same name. Each had received favors from respondent in the form of substantial donations for social events and there is evidence that each approached respondent on the matter of working conditions. It was quite within the discretion of the Board to dissipate this confusion and remove possible obstacles to the employees' right to self-organization by taking the O. W. C. out of the picture. H. J. Heinz Co. v. Nat. Labor Relations Board, 311 U.S. 514, 522, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Swift & Co. et al., 6 Cir., 127 F.2d 30.

■ We think there is sufficient evidence to sustain the disestablishment of the P. E. A. The Board is permitted to detect and appraise "imponderables permeating [the] * * * record" [International Ass'n of Machinists et al. v. National Labor Relations Board, 311 U.S. 72, 79, 61 S.Ct. 83, 88, 85 L.Ed. 50] and to find support, therefor, in the "whole congeries of facts" before it. Nat. Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368.

We do not undertake to review all the evidence in this large record. We think a pattern of "interference" by respondent may be discerned in the following:

The P. E. A. came into being as an independent union in November, 1939. It was a formidable opponent of National Association of Die Casting Workers, Local No. 5, affiliated with the C. I. O. and hereinafter referred to as the union, which had, since early in the year, been conducting a drive among respondent's employees by distributing pamphlets and circulars outside the plant. Contemporaneously union agitation was taking place in the plants in New York and the union, affiliated with C. I. O., claimed a majority there. About October 26, 1939, certain employees of the Cleveland plant conceived the idea of making a trip to Fayetteville to appraise these claims. The visit was made on October 27th and the men returned to Cleveland on October 28th. There is no evidence that respondent initiated this trip, but when approached upon the question of allowing the men to go and defraying their expenses it readily acquiesced.

Six delegates made the trip. They were met by Knapp, vice president and general

manager, were treated to cigarettes and received a guarded statement from Knapp touching the union situation in Fayetteville. The delegates were then placed in charge of Danforth, a foreman, known to them because he had formerly been in Cleveland and had been identified with the O. W. C. Danforth took them through the plant, although he seems not to have accompanied them later as they talked with employees. Biss, one of the delegates, testified that he came in contact with several union members but that they called him a "stooge" and would not talk with him until he was vouched for by an employee who knew him. Danforth took the men to the fluoroscope room which was in charge of Martin, head of the independent union. He would not talk to them very much then, but Danforth made it possible for them to see Martin after work, at which time he made large claims as to the strength of his union in the plant, and offered to co-operate in the formation of an inside union at Cleveland and supplied them with a few membership cards and blanks. Later that evening Danforth went with the delegation to a night club and no effort was made by them to go to a C. I. O. union meeting held the same night.

It is significant that these Fayetteville visitants were shown around by the management rather than ordinary employees and that they were so surely steered toward Martin. Respondent defrayed expenses of the trip to the extent of $120.00, part of which apparently was reimbursement for time lost by the men from the Cleveland plant.

We think there is a substantial inference to support the finding of the Board that the Fayetteville trip was a long step in the creation of the P. E. A. and that there is an additional inference that respondent adopted a friendly and cooperative attitude toward its establishment. John Beltz, once president of O. W. C., and another, set things in motion on November 1, 1939, three days after the Fayetteville junket. They called a meeting of about a dozen employees for the late afternoon of the next day, at which Barry, one of the Fayetteville party, was present. Following this meeting, things moved rapidly, and three days later, on Saturday night, Beltz and Barry sent 57 telegrams to certain employees, inviting them to an organization meeting the following day, November 5th. Four of the Fayetteville party, namely,

Barry, Kaput, Farbarik and Searle, former treasurer of O. W. C. and the B. A. R. E. club, were active in getting members for P. E. A. Webbeking, an O. W. C. president, was elected president.

Biss and Heeder were the other members of the Fayetteville company. Biss subsequently joined the union and both seemed to have leanings toward the C. I. O., but Biss testified that he saw Kaput going around the plant during working hours with blue cards obtained from Martin while at Fayetteville.

November was a month of ferment. Organization was in the air, with both the union and the P. E. A. claiming majorities. The union threatened to strike on November 11th, which date was subsequently moved up to November 21st. As early as November 9th, within a week of its inception, P. E. A. wrote the management claiming a majority and suggesting negotiations over wages and working conditions. Millspaugh declined and pointed out that the union also claimed a majority and had requested an election and that all negotiations would have to be postponed until majority representation had been determined.

Two meetings were held in November, one on the 18th and the other on the 22nd, by representatives of respondent, of the union and of the Labor Board, on the question of an election. Millspaugh testified that it was suggested that the union bring down their signed applications but that the union "stalled around." Plost of the Labor Board had no recollection that the union was unwilling to submit the application cards. The first meeting was inconclusive and Millspaugh testified that at the second the respondent submitted an agreement for an election for Saturday the 25th on company property. This suggestion was rejected by the union on the ground that since Thursday was Thanksgiving and Saturday not a regular working day, a large number of employees could not be notified. It also objected to holding an election on company property. This meeting likewise broke up without agreement. The next suggestion that the election be held on Tuesday of the next week was refused by respondent.

Respondent had in the meantime maintained contact with the P. E. A. and with what will appear to be unseemly haste, in view of the fact that an election on the following Tuesday could have determined majority representation once for all, re-

spondent acceded to a demand by P. E. A. for an immediate conference, which materialized in the negotiations and agreement of Saturday, November 25th.

These negotiations were unusual in more respects than one. They resulted in an agreement, including a wage increase, in a single afternoon of bargaining, one half of which was consumed in checking signatures. Further, although P. E. A. was able to show membership cards totalling 125 employees out of approximately 180, respondent refused to execute the agreement until each member of the P. E. A. had individually signed a copy. These signatures were obtained by P. E. A. committeemen and the contracts were turned over to respondent's counsel about midnight of the same day.

Respondent argues that the union's claim for majority representation was shown to be false by an election held on August 26, 1940, when it received only 67 votes out of a total of 153 ballots cast. But, by the same token, it may be observed that the votes cast against the union fell far short of the 125 members of the P. E. A. who signed up in the previous November.

■ We think that the evidence considered in the aggregate carries an inference sufficient to support the order of the Board. It is conceivable that a contrary inference might be drawn but the Board was not required to draw it. National Labor Rel. Board v. Nevada Consolidated Copper Corp., 62 S.Ct. 960, 86 L.Ed. —, decided by the Supreme Court April 27, 1942. We think the Board could justifiably infer that respondent was engaged in a course of subtle opportunism and that it took advantage of every new situation to go as far as it could to thwart the union and promote the P. E. A. This conclusion receives plausible support in quite substantial evidence of prejudice on the part of the management against the C. I. O.

■ However, we think that the order of the Board should be modified. Respondent should not be required to disestablish P. E. A. without setting forth the right of its employees to join any kind of labor organization of their own choosing. Westinghouse Elec. & Mfg. Co. v. Nat. Labor Rel. Board, 2 Cir., 112 F.2d 657, 661; National Labor Relations Board v. American Rolling Mill Co., 6 Cir., 126 F.2d 38, 42.

2(b) of the order will be amended by the addition of the following clause, to wit:

"But the employees are free to organize or join any union they choose, whether or not it is affiliated with the national union."

So modified, the order of the Board will be enforced.