## NATIONAL LABOR RELATIONS BOARD v. STANDARD OIL CO. et al.

### No. 7.

Circuit Court of Appeals, Second Circuit.

Nov. 1, 1943.

Malcolm F. Halliday, Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Joseph B. Robison, and Daniel Baker, and Ruth Weyand, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

John W. Davis, William A. Dougherty, and C. Horace Tuttle, all of New York City, for Standard Oil Co. and Standard Oil Co. of New Jersey.

Horace A. Teass, of New York City, for Bayway Refinery Employees' Ass'n.

Harry D. Field, of Newark, N. J. (Harold J. Field, of Bayonne, N. J., of counsel), for Bayonne Refinery Employees' Ass'n.

Before L. HAND, CHASE and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us on a motion by the Labor Board for an order enforcing a "cease and desist" order, which directed the respondents not to "dominate" or to "recognize" three unions, each composed only of employees in one of three New Jersey plants, and "completely" to "disestablish" them by withdrawing "all recognition" from them. It also contained a provision that the respondents should cease "In any other manner interfering with * * * the exercise of the right to self-organization * * * and to engage in concerted activities for the purpose of collective bargaining * * * as guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]." The chief issue is whether the three unions which succeeded an earlier "Joint Conference Plan," dating from 1918, were in their origin, or later became, so far dissociated from the "Plan" (as we shall call it), as to represent the uninfluenced will of the employees of the three plants. The respondents concede that the "Plan" became unlawful with the passage of the National Labor Relations Act in 1935, 29 U.S.C.A. § 151 et seq. but they insist—as do two of the three unions which have intervened—that shortly after the act was declared constitutional on April 12, 1937, there was so complete a break between the "Plan" and the new unions—which we shall follow the parties in speaking of collectively as the "Association"—that the Board should have found the vote of an overwhelming majority of employees, who favored the "Association," to have been free from any domination by the respondents, and to have set up such autonomous bargaining representatives as the act demands. The evidence covered about 5,500 pages, upon consideration of which the Board—following the examiner —decided that the "Association" was a "continuation" of the "Plan"; and that the influence of the respondents had so far persisted up to the time when the hearings closed in November, 1941, as to make "disestablishment" necessary as a condition upon any free choice by the employees. The Board also denied a motion to allow the respondents and the "Association" to introduce new evidence.

The findings, covering as they do some seventy-two printed pages in narrative form, are too long to state in detail; nor is it necessary that we shall do more than give their upshot. The situation was the not unusual one in which before the act went into effect there was in existence a union of company employees, organized for collective bargaining, in which the employer took an active part, either by directly, or indirectly, subsidizing the union, or by presiding at joint meetings, or by expressing his preference for such a union as against affiliation with some more militant national union, or in some other way interfering in the free choice of his employees. That union having become unlawful, the employees then formed a new one, confined as before to those in the plant, but now organized without any financial support from the employer; after express disclaimer by him of any intention to influence the employees' choice of representatives; and at times, as in the case at bar, after an explicit declaration that he would recognize and deal with whomever they might select to represent them. In such cases the Board has always insisted that there must be such a break with the old union as to make certain that the new one was not formed in the hope of retaining the employer's past favor, and that the employees have not eschewed affiliation with any national union because they feared his hostility. This rupture with the old union the Board has expressed by the word, "disestablishment," and we do not understand that it has any further significance. In the case at bar much of the discussion turned upon how far the "Association" was a "continuation" of the "Plan," which in turn was to be determined by ascertaining how far the employees supposed that it was only a "modification," or "revision" of it; rather than a brand-new organization. But that too is a conclusion only mediate to the crux of the matter, which remains whether the employees have been properly disabused of the earlier influences under which—in the case at bar—they had been bargaining for the preceding nineteen years.

The "Association" was formed about a month after the act was declared constitutional, at the initiative of those employees who had been employees' representatives under the "Plan"; and some of the employees' and employer's representatives expressed themselves as though they still regarded it as the "Plan," revised to meet the necessities of the new law. On the other hand, the employer circulated a letter to all the employees very shortly after the decision of the Supreme Court, in which it declared that the National Labor-

Relations Act protected "the rights of employees to bargain collectively * * * without domination, interference, coercion, or restraint"; and that nothing in the act need "cause the Company to change its long-established policy of not discriminating against any employee because of membership or nonmembership in any church, society, fraternity, or union." The letter concluded by saying that the employer would bargain with any representative of a majority of the employees, although it would pay no expenses of elections or "other like costs"; and that, if the employees wished a "collective bargaining agency," it must be "developed and established by themselves." The respondents never paid any of the "Association's" expenses after it was organized, though they set up the "check-off," and apparently extended some extremely trivial favors to it at rare intervals, which were however too unimportant to count as "substantial." We need not say whether on this showing we should have come to the Board's conclusion that in November, 1941, four and a half years after the "Association" was formed, and at a time when there can be no doubt that a very great majority of the employees still adhered to it, their adherence was a consequence of some carry-over of the respondents' earlier favor of the "Plan," and its well known preference for it over an alliance with any national union. We understand the law to be that the decision of the Board upon that issue is for all practical purposes not open to us at all; certainly not after we have once decided that there was "substantial" evidence that the "disestablished" union was immediately preceded by a period during which there was a "dominated" union.

Since we recognize how momentous may be such an abdication of any power of review, especially as it may result in the loss of those very rights of employees which it is the purpose of the act to protect, we feel justified in stating our reasons a little at length, even though we have in effect already decided the issue. Westinghouse Electric & Manufacturing Co. v. National Labor Relations Board, 112 F.2d 657, affirmed per curiam, 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108. That it is an issue of fact admits of no doubt, and everyone agrees that in general we do have some power, however circumscribed, to review the Board's decision upon questions of fact. In this instance, that question is whether the employer's influence upon the will of his employees—which by hypothesis resulted from their past relations and his known wishes and conduct—determined their choice when they formed the new union. That concerns only human motives and of a kind with which courts are not unaccustomed to deal. At first blush it might seem therefore to be no different from that involved in deciding for example what actuated an employer in discharging an employee: i.e., whether he was trying to maintain discipline, or to rid himself of a troublesome union organizer. We should have a review of that question, for we should be as competent as the Board to deal with it; but the question of how deeply an employer's relations with his employees will overbear their will, and how long that influence will last, is, or at least it may be thought to be, of another sort, to decide which a board, or tribunal chosen from those who have had long acquaintance with labor relations, may acquire a competence beyond that of any court. That there can be issues of fact which courts would be altogether incompetent to decide, is plain. If the question were, for example, as to the chemical reaction between a number of elements, it would be idle to give power to a court to pass upon whether there was "substantial" evidence to support the decision of a board of qualified chemists. The court might undertake to review their finding so far as they had decided what reagents had actually been present in the experiment, for that presumably would demand no specialized skill. But it would be obliged to stop there, for it would not have the background which alone would enable it to decide questions of chemistry; and indeed it could undertake to pass upon them only at the cost of abandoning the accumulated store of experience upon the subject. It is true that to a large degree we do just that in ordinary trials, when we call specialists as witnesses; but that was not always the way in which the common law met the problem (XV Harv.L.R. pp. 40–42), and in so far as we now increasingly have recourse to administrative tribunals it is no longer the way.

Conceivably labor disputes might have been considered as demanding no such specialized knowledge for their solution. On the other hand they have been made the occasion of wide study, and a very large literature has arisen, with which

888

those only are familiar who have become adepts. Like any other group of phenomena, when isolated. and intensively examined, these relations appear to fall into more or less uniform models or patterns, which put those well skilled in the subject at an advantage which no bench of judges can hope to rival. This the Supreme Court has recognized in a number of decisions, particularly when the Board's decision upon the question now before us has come up. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 459–461, 60 S.Ct. 307, 84 L.Ed. 396; Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, supra, 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed.. 1108; National Labor Relations Board v. Southern Bell T. & T. Co., 319 U.S. 50, 63 S.Ct. 905, 87 L.Ed. 1250. Theoretically there may be situations in which the cleavage between the old union and the new is such that a court could say that there was no "substantial" evidence to support an order of "disestablishment." Labor relations are after all not like the exact sciences; they do concern occurrences which, if not within the range of ordinary experience, are not totally alien to it. But any such reserve is not very real; and certainly when the sequence is not broken by a substantial period, marked at the outset by an outright repudiation of whatever has gone before, we shall regard the matter as not open to review unless the Supreme Court advises us to the contrary.

■ The next question concerns that part of the order—Article I(d)—which directs the respondents to "cease and desist" from in "any other manner" denying to their employees their rights secured under section seven. This the Board embodied in its order, in spite of the fact that the only "unfair labor practice" of which it found the respondents guilty was that mentioned in § 8(2), 29 U.S.C.A. § 158(2): i.e., "dominating" the "Association." That now seems to Judge CHASE and me directly contrary to the ruling of the Supreme Court in National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, which, as we understand it, limited the injunction to those "unfair labor practices" of which the employer had been found guilty. It would follow that to issue an injunction under § 8(1) the employer must have done something not specifically mentioned in the other subdivisions of § 8. The question first arose in this circuit in F. W. Woolworth Co. v. National Labor Relations Board, 2 Cir., 121 F.2d 658, 662, and very shortly thereafter in National Labor Relations Board v. Air Associates, 2 Cir., 121 F.2d 586, 592. Both concerned only violations of § 8(3), yet in each case we sustained the broad clause. On the other hand less than two weeks later in two decisions rendered almost simultaneously, we declared that, although the court as then constituted thought the clause improper, we would yield to the authority of National Labor Relations Board v. Air Associates, supra. In the first of these two cases—National Labor Relations Board v. Moench Tanning Co., 2 Cir., 121 F.2d 951, 954—the violations were of § 8(2) and § 8(5), and in the second—National Labor Relations Board v. Federbush Co., 2 Cir., 121 F.2d 954, 957—they were of § 8(5) alone. Finally, in Sperry Gyroscope Co. v. National Labor Relations Board, 2 Cir., 129 F.2d 922, 931, we sustained the clause when the violations were of § 8(2) and § 8(3). We have thus so often interpreted National Labor Relations Board v. Express Pub. Co., supra, in accord with the order before us, that it seems best to adhere to that interpretation until the Supreme Court passes upon the question again; especially as we infer from a number of cases that have recently come before us, that the Board uniformly incorporates the clause in its order. As the matter stands it can hardly serve to add to the confusion until some authoritative word shall be said.

■ The order will be modified by changing the phrase, "reorganization or successor thereto" in Article I(b) of the order to "colorable reorganization or successor thereto"; and by adding the clause which we added in Westinghouse Electric & Manufacturing Co., supra, 2 Cir., 112 F.2d 657, 661. Our ruling in that case has been followed in Colorado F. & I. Corp. v. National Labor Relations Board, 10 Cir., 121 F.2d 165, 176; National Labor Relations Board v. American Rolling Mill Co., 6 Cir., 126 F.2d 38, 42; and National Labor Relations Board v. Precision Castings Co., Inc., 6 Cir., 130 F.2d 639, 643.

As to the respondents' motion for leave to put in new evidence before the Board, after what we have already said, it is plain that the decision rested altogether in its discretion.

An enforcement order will pass in accordance with the foregoing.

CLARK, Circuit Judge (concurring).

As indicated in the opinion I agree except that for my part I am satisfied we are correctly applying the Express Publishing ruling. That ruling was explicitly restricted to the situation there present of failure of negotiations leading to the employer's refusal to bargain, contrary to § 8(5) of the Act, with a union in all other respects left undisturbed. But, as the Court says at page 434 of 312 U.S., 61 S.Ct. at page 699, 85 L.Ed. 930, this was "wholly unrelated to the domination of a labor union or the interference with its formation or administration or financial or other support to it," contrary to § 8(2), or discrimination against union employees, contrary to § 8(3). The Court thus neatly separated the issue before it from the two most burning issues in labor relations— those of "company unions" or of discriminatory treatment of employees—where violations go to the very heart of the Act. N. L. R. B. v. Entwistle Mfg. Co., 4 Cir., 120 F.2d 532, 536; N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 592; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 891, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549.

Hence I do not believe the Court intended drastically to limit the Board's discretion to determine the appropriate remedy to be applied in these two most important situations. In due course the Court may wish to define its ruling further; the justices were sharply divided, the decision provoked doubt among commentators,[1] and its effect has now to be sharply debated in most of the Board's cases coming before us. It appears to have been cited, with varying divergences, in some seventy-five cases in the little over two years since its rendition. But until we are told more, I am convinced our previous decisions should stand and do control here.

---

[1] 41 Col.L.Rev. 911, 29 Geo.L.J. 1026, 39 Mich.L.Rev. 1219, 27 Va.L.Rev. 956, 26 Wash.U.L.Q. 554; cf. 53 Harv.L.Rev. 472.