INDEPENDENT EMPLOYEES ASS'N OF NEPTUNE METER CO. v. NATIONAL LABOR RELATIONS BOARD.

NEPTUNE METER CO. v. SAME.

NATIONAL LABOR RELATIONS BOARD v. NEPTUNE METER CO.

Nos. 70, 78, 79, Dockets 20276, 20242, 20246.

Circuit Court of Appeals, Second Circuit.

Nov. 29, 1946.

SWAN, Circuit Judge, dissenting.

———◇———

Sweet & Sweet, of New York City (Irving Sweet, of New York City, of counsel), for petitioner Independent Employees Association.

Simpson, Thacher & Bartlett, of New York City (Edward L. Coffey, Delmar Karlen, Chester C. Davis, and David S. Junker, all of New York City, of counsel), for Neptune Meter Company.

Gerhard P. Van Arkel, A. Norman Somers, Morris P. Glushien, Dominick L. Manoli, Emily Cronheim, and Leon Novak,

all of Washington, D. C., for National Labor Relations Board.

Before SWAN, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

We have before us here two related orders: (1) The Board petitions for enforcement of its order, dated October 21, 1944, directing the "disestablishment" by Neptune Meter Company of a labor union, Employees' Representative Organization (E. R. O.)[1] (2) Neptune Meter Company and a labor union, Independent Employees' Association of Neptune Meter Company (I. E. A.) each petition us to review and set aside a Board order, dated March 6, 1946, directing the "disestablishment" of I. E. A. by the company;[2] the Board petitions for enforcement of that order.

### The Statutory Provisions

The Board based its orders on findings of violations by the company, as employer, of § 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 2). Since experience indicates that, in argument of cases like this, the language of the statute is often forgotten, we quote the pertinent provisions:

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"Sec. 8. It shall be an unfair labor practice for an employer—

(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6(a), an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

Section 8(2) is the principle basis of the Board's orders. It "Does not forbid merely 'interference' by an employer. It also, disjunctively, provides that 'domination' of a union by an employer is unlawful. Domination arising from earlier acts of an employer may be violative of the Act even when the employer has stopped all active 'interference.' * * * And, in applying that provision, the courts and the Board must be guided by the statutory interpretation of the Supreme Court. The central factor, we are told, is the state of mind of the employees. In International Ass'n. of Machinists v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, the Supreme Court said that 'where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.' And the court further said that such a conclusion may be reached by the Board 'even though the acts of the so-called agents were not expressly authorized or might not be attributable to' the employer 'on strict application of the rules of respondeat superior,' since under that Act 'we are dealing * * * not with * * * technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence.' "[3]

The Board, in connection with its first order, decided that the Neptune Company dominated E. R. O.; this the company virtually conceded in its briefs and oral argument in this court. In connection with its second order, the Board decided that the company also dominated I. E. A. The principal question for our decision is whether, in reaching this conclusion, the Board acted upon findings of fact supported by substantial evidence and upon rational factual inferences drawn from those findings.

### The Facts as Found by The Board

---

[1] 58 N.L.R.B. 1240.
[2] 66 N.L.R.B. 292.

[3] Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 923, 924.

We think there is substantial evidence to support the Board's findings of fact which are, in effect, as follows:

For some sixteen years, from 1919 to August 1, 1935, the company had dominated a labor organization of its employees, the Congress of the Neptune Meter Company. The Congress consisted of a House of Representatives, a Senate, and a Cabinet. The House was composed of representatives of the non-supervisory employees of various departments; the Senate represented the foremen and supervisory employees; and the Cabinet, in which the executive power of the Congress was vested, was composed solely of representatives of the directors and officers of respondent. "Bills" passed by the House, and concurred in by the Senate, relating to wages, hours, or working conditions as well as amendments to the constitution became effective only with the approval of the Cabinet. Membership in the Congress of all employees was automatic and conferred only the right to vote in an annual election of representatives. It carried no obligation to pay dues. No provision was made for participation in the affairs of the Congress by the employees generally. No meetings of the general membership were held. The House officers were elected, not by the employees generally, but by the representatives. The company paid various expenses to the Congress. It furnished to the Congress stenographic service, printing and mimeographing machines and paper for ballots and notices. It permitted the Congress to use plant bulletin boards. It paid the representatives for all time spent in meetings of the organization or on other business of the Congress. All meetings and business of the Congress were conducted on respondent's premises.

On August 1, 1935, about a month after the effective date of the National Labor Relations Act, Ricketts, vice-president and manager of the company, advised a meeting of the House that the Act made it unlawful for the company to contribute support to a labor organization and that the Congress plan must be discontinued. He announced that thereafter the Senate would be a Foreman's Meeting, but that "if the majority of employees so desire, they can continue this representative plan and the company will allow them to meet in the regular meeting-room once every two weeks on the company's time." Minutes of this meeting were posted on the bulletin-boards in the plant. A poll of the employees was conducted at the plant during working hours, the employees balloting on several questions including, "Are you satisfied with the present form of Representation? Are you satisfied with your present Representatives?" The great majority having answered yes, the president of the House appointed a Committee of Representatives to draft a Constitution for a revised representative organization, called the Employees' Representative Organization (E. R. O.). On October 1, 1935, the House amended the draft presented by the Committee and adopted it.

The structure of E. R. O., except for the elimination of employer participation, was substantially like that of the Congress: All employees automatically became members; there were no dues and no membership meetings. With a few exceptions, the employees who had constituted the old House remained as representatives of E. R. O., and House officers and House Committee members continued in corresponding posts in E. R. O. The Company permitted meetings of E. R. O. on company property during working hours. It paid the representatives of E. R. O. for time spent in conducting its affairs or transacting its business during working hours. It also permitted E. R. O. elections to be conducted on its premises and during working hours. It furnished various kinds of supplies to E. R. O. and permitted it to make free use of its printing and mimeographing machines.

In the latter part of 1936, when the C. I. O. became active among the employees, E. R. O. asked the company for a collective bargaining agreement, and such an agreement was executed to become effective in 1937. Similar agreements were made in the years following.

When E. R. O. had been functioning for some nine years after the Act became effective, the Board on June 8, 1944, issued a complant against the company based on its relations with E. R. O. A copy of the

452

complaint having been served on E. R. O., its president, Landi, a week later, on June 15, called a meeting of its representatives. Landi told the meeting that the practice of holding E. R. O. meetings on the company's premises might be violative of the Act. The meeting decided to "hold * * * future meetings on the outside and to continue to hold the Organization in its existence"; it also decided to take a vote of the employees to find out whether they "still want to carry on with our Organization by holding meetings on the outside." On June 20, a notice, signed by Landi as E. R. O. president, was posted in the company's plant, stating that the next day a vote by ballot would be taken on that subject. Such balloting was conducted on June 21, by E. R. O. representatives, in the plant and during working hours. A large number of employees voted in the affirmative. At a meeting of E. R. O. representatives, held on June 22, in the plant during working hours, Landi appointed an "Organizing Committee" of five such representatives to draw plans, pursuant to the June 21 vote, to be presented to the employees at a mass meeting. Koopman, who had been Chairman of an important E. R. O. Committee, was named as one of the members of this "Organizing Committee." The minutes of the June 22 meeting, showing the appointment of this Committee and the names of its members, was posted in the plant.

The Board conducted its hearings as to E. R. O. from July 10 to July 12. In this interval, the persons who on June 22 had been appointed members of the "Organizing Committee" met informally with Dauwalter, the E. R. O. Secretary, and with another E. R. O. representative. Koopman acted as Chairman of this informal meeting which concluded that, on the basis of the evidence taken at the Board's hearing, the Board would probably hold that E. R. O. was not independent of the company. The meeting decided that it would therefore be necessary "to form a brand new organization." The "Organization Committee" appointed on June 22 never met or functioned. But the group, just above described, which had met informally, constituted themselves an "Organizing Committee" to form a "new organization" and, to that end, to solicit an initiation fee of one dollar from each employee. As a result, about $700 was thus collected. This money was turned over to Dauwalter, who was still the E. R. O. Secretary.

At Koopman's request, Landi, the E. R. O. President, called a special meeting of some twenty employees on July 18 which was told of the "brand new organizing committee" and that no further meetings of E. R. O. would be held. However, no formal action to dissolve E. R. O. was then taken, nor were the minutes of the July 19 meeting recorded or posted, nor was any formal notice then given to employees, other than the twenty present at this meeting, that E. R. O. had been discontinued.

On July 20, the Committee decided on Independent Employees' Association (I. E. A.) as the name of the new organization. Thereafter the Organizing Committee distributed, outside the plant and not in working hours, membership cards to the employees who had previously paid initiation fees.

On August 29, the Committee similarly distributed notices of an "initial organization meeting" of I. E. A. to be held the next night, August 30, after working hours and outside the plant. The minutes of that meeting, referred to as "the first meeting" of I. E. A., show that Koopman, described as "Chairman of the Organization Committee," presided. He explained that a Committee had originally been formed to devise means of continuing E. R. O. so reorganized as to eliminate the use of company time and property, but that it had been decided subsequently to form "a brand new independent organization," with E. R. O. as "a thing of the past." The meeting elected as temporary officers of I. E. A. persons who had in some manner previously served in some official capacity in E. R. O. The meeting also approved of a decision to retain a law-firm to advise I. E. A. This law-firm had drafted a constitution and by-laws for I. E. A. but they were not then adopted.

On September 6, six days after this meeting, the Board's trial examiner issued his intermediate report finding that E. R. O. was company-dominated and recommending that the company disestablish it.

On September 7, I. E. A. representatives told the company that I. E. A. represented a majority of the employees and asked a conference for the purpose of establishing its representative status and of obtaining recognition. On September 14, the company replied that recognition of I. E. A. would be premature because the Board's decision as to E. R. O. had not yet been rendered.

A week later, on September 21, the company posted notices stating that E. R. O. was disestablished. At an I. E. A. meeting on October 4, the company's refusal to recognize I. E. A. was reported. It was the sense of the meeting that immediate recognition should be asked. At this meeting, the I. E. A. constitution and by-laws were adopted.

Two days later, on October 6, a representative of the International Molders and Foundry Workers of America, A. F. of L. (the "Molders") asked the company to recognize it as the bargaining representative of the employees in the company's foundry; he offered to show the application cards of those employees. The company replied that it would not bargain with any union unless and until it had been certified by the Board.

Three days later, on October 9, I. E. A., by letter, again asked the company for recognition. On October 12, six days after the company's refusal to deal with the Molders union, company representatives met with the temporary officers of I. E. A. and Koopman. At this meeting, after discussion in which mention was made of a walkout, the company agreed to recognize I. E. A. on proof of its majority status. On October 14, I. E. A. submitted membership cards to the company; as a check showed that I. E. A. had been designated by a majority of the employees, the company thereupon recognized it.

A week later, October 21, the Board issued its order requiring E. R. O. to be disestablished. The company then again posted notices disestablishing E. R. O.

Subsequent negotiations resulted in execution of a collective bargaining agreement between I. E. A. and the company, to become effective January 1, 1945. The contract was to endure for a year and to be automatically renewable unless notice to the contrary was given. It included an exclusive recognition clause, provision for voluntary check-off of dues, and other clauses dealing with wages and hours.

■ On March 22, 1945, the Board issued its complaint with respect to I. E. A. After hearings duly held, the trial examiner issued an intermediate report on June 16, 1945. On March 6, 1946, the Board made a decision and order, which adopted the examiner's report, with certain modifications, and which found the facts in effect as above set forth. Since there is substantial evidence to support these findings, we must take them as true.

### The Board's Factual Inferences

On the basis of inferences from these facts thus found, the Board further found, in effect, as follows: The fact that the company failed to disestablish E. R. O. before the formation of I. E. A. and the fact that I. E. A. was initiated and sponsored by a group of E. R. O. officers and representatives suggested to the employees a substantial identity between I. E. A. and E. R. O.; the employees therefore would reasonably conclude that the company approved I. E. A. as it had E. R. O. and the Congress, so that the employees' choice of I. E. A. was "not as free as the statute demands."

The Board so concluded despite the fact (1) that "I. E. A. has made a consistent effort to divest itself of the indicia of company domination"; (2) that it "differs structurally from the E. R. O. in that" its "constitution and by-laws provide for regular meetings of the general membership, membership dues and initiation fees, and in autonomy in the election of officers and further conduct of its business as a labor organization"; (3) that, with few exceptions, its permanent officers have not been prominently identified with the Congress or E. R. O.; (4) that its meetings have been held away from the company's premises and outside of working hours; and (5) that its contract of January 1, 1945, with the company "appears to have been agreed upon after several bargaining conferences and incorporates certain benefits not previously enjoyed by the employees."

454

On the basis of its findings and inferences, the Board ordered that I. E. A. be "disestablished."

### This Court's Limited Authority

We must, as above noted, accept the facts as found by the Board, regardless of whether, independently, we would have so found. The decisions of the Supreme Court put it beyond doubt that it is also irrelevant whether from those facts we would have drawn the factual inferences drawn by the Board.[4]

▆ As we have heretofore stated, in opinions by Judge Learned Hand, we have interpreted those Supreme Court decisions to mean that, when we have decided that the substantial evidence supports the Board's findings, our statutory authority is severely restricted to that of determining (1) whether the Board's factual inferences as to employer-domination are so irrational that they cannot stand, and (2) whether, if they do stand, those inferences justify the Board's order. See Westinghouse Electric & Mfg. Co. v. N. L. R. B., 2 Cir., 112 F.2d 657, affirmed per curiam, 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108; N. L. R. B. v. Standard Oil Co., 2 Cir., 138 F.2d 885; cf. Herzfeld v. Federal Trade Commission, 2 Cir., 140 F.2d 207, 209.

In the Standard Oil case [138 F.2d 886,] Judge Hand said that the "crux of the matter" in cases of this type is "whether the employees have been properly disabused of the earlier influences under which * * * they had been bargaining for the preceding * * * years," and went on to say, "We understand the law to be that the decision of the Board upon that issue is for all practical purposes not open to us at all; certainly not after we have once decided that there was 'substantial' evidence that the 'disestablished' union was immediately preceded by a period during which there was a 'dominated' union * * * Theoretically there may be situations in which the cleavage between the old union and the new is such that a court could say that there was no 'substantial' evidence to support an order of 'disestablishment.' Labor relations are after all not like the exact sciences; they do concern occurrences which, if not within the range of ordinary experience, are not totally alien to it. But any such reserve is not very real; and certainly when the sequence is not broken by a substantial period, marked at the outset by an outright repudiation of whatever has gone before, we shall regard the matter as not open to review unless the Supreme Court advises us to the contrary."[5] We know of no subsequent Supreme Court decision which so advises us.

We perceive no significant differences between the facts of the instant case and those in the Westinghouse and Standard Oil cases. It is scarcely debatable that E. R. O. was but the Congress under a new name. Thus, unquestionably, this employer, uninterruptedly, for some twenty-five years, dominated this two-named union, and for the last nine of those years, from 1935 to 1944, did so unlawfully, in violation of § 8 of the Act. The pivotal issue

---

4 See, e.g., N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N. L. R. B. v. Newport News Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

5 In Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 924, we said: "Perhaps it should be unnecessary to do so, but, in view of recurrent misconceptions encountered by us in Labor Board cases, we think it well to state at the outset that, under repeated and unequivocal rulings of the Supreme Court, it is not proper for us to consider whether we would have made the same findings of fact as did the Board or whether, on the basis of those findings, assuming them to be correct, we would have deemed it wise to make the order entered by the Board. Our function, says the Supreme Court, is narrowly limited to determining (a) whether there was substantial evidence to support the Board's findings of fact and (b) whether, on the basis of those findings, if thus supported, the Board had the statutory power to make its order. It is our duty in this case to comply with the Act enacted by Congress, as interpreted by the Supreme Court, our personal views being entirely irrelevant."

for the Board was therefore whether this quarter of a century of domination suddenly evaporated in 1944 with the creation of I. E. A. That it did not, the Board concluded as a factual inference from the facts which it had found. We see no more reason for rejecting that inference in this case than we did for rejecting like inferences in the Westinghouse and Standard Oil cases supra. That here, as in those cases, the "sequence" was "not broken by a substantial period, marked at the outset by an outright repudiation of what" had "gone before * * *" appears from the following facts among others:

Prior to September 21, 1944—before which time the company had not in any way indicated a severance of its relations with its captive E. R. O.—these events had occurred: (1) A committee consisting of E. R. O. officials and representatives organized I. E. A.; (2) this committee grew out of a committee which, a short time previously, had been appointed by the E. R. O. President; (3) this new committee collected I. E. A. initiation fees and paid them to the E. R. O. Secretary; (4) the E. R. O. President called a special meeting of employees; (5) the minutes of this meeting describe it as "the first meeting of the Independent Employees Association"; (6) Koopman, a prominent E. R. O. representative, presided at this "first meeting" of I. E. A.; (7) that same meeting elected as temporary officers of I. E. A. persons who had acted in official capacities in E. R. O. All this before the company took any steps to "disestablish" E. R. O. Moreover, subsequent to the first notice of "disestablishment" of E. R. O., the company refused to consider whether the Molders' Union represented a majority of the molders in the company's employ, unless and until the Board certified that union; but, six days after this refusal, the company considered the majority status of I. E. A. without imposing a similar condition of Board certification.

Indeed, one need not resort to any doctrines peculiar to so-called "administrative law" to sustain the Board's inferences. For, if these inferences had been made by a jury, they would have been impregnable. Here, as suggested in an earlier opinion,[6] we derive illumination from the following: In a conspiracy suit, if it has been established that a person participated in an unlawful conspiracy, he then has the burden of overcoming the inference (sometimes erroneously labeled a "presumption") that he has continued that participation, by proof of acts satisfactorily disclosing a severance of that relation. The question of continued connection with the conspiracy is one of fact for the jury.[7] So here, if the crucial issue (i. e., whether the company had taken sufficient steps to disabuse the employees' minds of the belief that in 1944 they were still subject to unlawful employer-domination) had been left to a jury, and if the jury had returned a general verdict against the company, we would not, on the evidence in this record, dream of disturbing the jury's verdict (i. e., its inference from the facts) even if we would not ourselves have arrived at its conclusion. Since, then, we would sustain a jury's general verdict grounded upon the evidence in this record, we cannot say that the Board's inferences are so irrational that we may reject them. For the Supreme Court has held that the specifically stated inferences of the Board—a body of "specialists in a particular field advised by experts"[8]—are, to say the least, entitled to as much dignity as a jury's general verdict.

The facts that the employees express satisfaction with I. E. A., that the structure of I. E. A. differs from that of E. R. O., and that its permanent officers with few exceptions have not been persons prominently identified with E. R. O. or the Congress, would not have rendered irrational a jury's verdict that I. E. A. was employer-dominated. No more do those facts permit us to over-turn the Board's conclusions. Considering the Board's findings, supported as they are by substantial evidence, "We must treat this case as a

---

6 Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 927, 928.

7 See cases cited in 2 Cir., 129 F.2d at page 928.

8 Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 928.

simple one in which employees designate a company dominated union as their bargaining representative." [9]

██ The company and I. E. A. argue, however, that the effectiveness of I. E. A. in bargaining with the company does not jibe with the thesis of company domination. Responding to a similar contention, we said in Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 930: "It is argued, however, that this conclusion must be wrong because, in negotiations between the company and Brotherhood, important differences developed. The argument runs that a dominated union would accept without question whatever the employer offered. But there may be 'domination,' within the meaning of the Act, which does not reach the point of abject servility. The test, according to the Supreme Court, is whether there is 'free collective bargaining free from all taints of an employer's domination * * * or influence.' International Ass'n of Machinists v. N. L. R. B., supra. A minor may be under his father's influence despite the fact that he may not always accept all his father's dictates. . That a client had argued with his lawyer about the size of the lawyer's fees would not compel the conclusions that a contract between them relating to the client's property was not voidable. Proof that there were some areas of disagreement between a guardian and ward would not alone dispel the 'presumption' that dealings between them were not at arms' length. Negotiations by a union only partially free of employer influence are not what the statute contemplates. It is for the Board, not the courts, to find whether the degree of independence of company influence is sufficient to escape condemnation as constituting domination forbidden by the Act. N. L. R. B. v. Link-Belt Co., supra; cf. Morgan Stanley Co. v. Securities & Exchange Comm. [2 Cir., 126 F. 2d 325]; Detroit Edison Co. v. Securities & Exchange Comm. [6 Cir., 119 F. 2d 730] * * * It is suggested that

for three years, since June 1939, the Brotherhood has served as a gargaining agent to the satisfaction of a majority of the employees and that the Board's order is unwisely disruptive. But that suggestion begs the basic question, which is whether the employees were free to choose or reject Brotherhood. Since the Board finds that they were not free, and those findings are supported by the evidence, what we have here is a union company-dominated, * * * Disruption of such dominated relations is authorized by the Act. The wisdom of that statutory policy is not for the courts to consider." [10]

██ Having in mind, then, our narrowly limited authority, we think that we may not say that the Board erred with respect to the crucial issue.

### The Board's Orders

██ The Board's order of October 21, 1944, as to E. R. O. has not become moot, for the employer's compliance with such an order, it has been held, does not create mootness. N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. However, there is now no need for enforcement as to so much of that order as requires posting of notices with respect to E. R. O.

██ Part of the order of March 6, 1946, forbids recognition of I. E. A. or of any other labor organization until it has been certified by the Board. We have been referred to an unreported order of the Third Circuit, entered May 2, 1941, in N. L. R. B. v. Jersey Maid Corp., adjudging the employer in contempt and enjoining it for a period of one year from recognizing any union not thus certified. Here there is no time limitation; application for certification of a union may be made at any time. In the circumstances, we consider this portion of the order within the Board's power conferred by § 10(a) and (c) of the Act, 29 U.S.C.A. § 160 (a, c),[11] for that "Power extends to any

---

[9] Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 932.

[10] See also N. L. R. B. v. Newport News Co., 308 U.S. 241, 251, 60 S.Ct. 203, 84 L.Ed. 219.

[11] These provisions, so far as pertinent, read as follows:

"Sec. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice [listed in section 8] affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or pre-

remedy appropriate to redress the unfair labor practices which the employer is found to have committed." NLRB v. American Laundry Machinery Co., 2 Cir., 152 F.2d 400, 401; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 931; cf. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658.

A helpful analogy may be found in B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367. There the Court held that the owner of a valid patent was not entitled to a decree for infringement because it had "abused" the patent by improper conditions in its patent licenses. The patent-owner advised the Supreme Court that it would forthwith cease that improper conduct and offered to grant unconditional licenses. But the Court said: "It will be appropriate to consider petitioner's right to relief when it is able to show that it has fully abandoned its present method of restraining competition in the sale of unpatented articles and that the consequences of that practice have been fully dissipated." We think that equivalent considerations justify a "breathing spell" here. "Nothing is gained and much time and effort is lost by a discussion of the correct definition of 'disestablishment.' That word occurs nowhere in the Act. One suspects that it is attractive because mouth-filling. We should not be bewitched by it. It is merely a label for the allowable means to achieve enforcement where there has been a violation of § 8(2) through 'domination' or 'interference,' in which event the Board has broad statutory powers to prevent its continuance * * * The choice of remedies is for the Board." [11a]

█ The company suggests that the employees may insist on perpetuating I.

E. A. and, if it be not recognized by the Board, they may strike, thus seriously disturbing the company's business. But we assume that the employees will respect our decree enforcing the Board's order; see N. L. R. B. v. National Broadcasting Co. Inc., 2 Cir., 150 F.2d 895, 900.

█ The orders should, however, be modified, in line with our ruling in Westinghouse Electric & Mfg. Co. v. N. L. R. B., 2 Cir., 112 F.2d 657, 661, by adding a provision that the employees are not obligated to join or organize a union affiliated with a national union.

Petitions to review denied; orders as modified affirmed.

SWAN, Circuit Judge (dissenting).

This court has gone further than several of the circuit courts of appeal in saying that a decision by the Board as to domination is practically non-reviewable. National Labor Relations Board v. Standard Oil Co., 2 Cir., 138 F.2d 885, 888. But even there we recognized that "Theoretically there may be situations in which the cleavage between the old union and the new is such that a court could say that there was no 'substantial' evidence to support an order of 'disestablishment.'" I think we should hold that this is such a case; for I see no justification in the facts found by the Board for inferring that the company interfered with or dominated I. E. A. Acting independently and without any suggestion from their employer, the employees decided that it was necessary to abandon E. R. O. and "form a brand new organization"; they engaged an attorney to draft a constitution and by-laws for I. E. A.; these were adopted at a meeting on October 4th, which was after the company had posted the notice of September 21st disestablishing E. R. O. and notifying its employees that they were free to join C. I. O. or any oth-

vention that has been or may be established by agreement, code, law, or otherwise * * *.

"(c) If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act * * *."

[11a] Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 931.

458

er labor organization; and recognition was not granted I. E. A. until after its officers had threatened to strike if it were not recognized, and after the company had determined by checking the membership cards that it represented a majority of the employees. Naturally, it was true that some of the leaders in E. R. O. took a leading part in organizing I. E. A. If this is enough to taint the latter, I do not see how an independent union can ever be organized, for the leaders among the employees will necessarily be the initiators of the new organization. Only in point of time was I. E. A. the "successor" to E. R. O.; for, as already noted, before its organization was completed the company had given formal notice disestablishing E. R. O.

The provision in the order of March 6th forbidding recognition of any union until it shall be certified by the Board will necessarily result either in compelling the employees to join a union affiliated with C. I. O. or A. F. of L., or in leaving them without a collective bargaining representative for an indefinite period of time, because, in view of the Board's finding as to domination, no request by I. E. A. for an election would be granted, nor would the name of I. E. A. be allowed to appear on the ballot if an election were held at the request of any other union. Nor can I conceive of any way in which the employees could in the near future reorganize I. E. A. or form a new unaffiliated union that the Board would hold to be untainted by domination. In short, the "remedy" applied destroys the very right which it purports to preserve, namely, the right "to bargain collectively through representatives of their own choosing."